TH:AP/ML/BG
F. #2020R01002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                    Docket No. <u>20-CR-548 (S-2) (WFK)</u>

HERBERTH RODRIGUEZ,
     also known as "Kepa," and
ELIAS MARTINEZ VILLANUEVA,
     also known as "Rebelde,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>MEMORANDUM OF LAW IN SUPPORT OF</u>
<u>THE GOVERNMENT'S MOTIONS *IN LIMINE*</u>

                                    JOSEPH NOCELLA, JR.
                                      United States Attorney
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

Andrés Palacio
Megan Larkin
Brachah Goykadosh
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES .....................................................................................................iii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 2

    A.    The Enterprise: The 18th Street Gang ....................................................... 2

    B.    The October 10, 2020 Attempted Murder of John Doe-1.......................... 3

    C.    The November 1, 2020 Murder of Diego Vásquez.................................... 4

ARGUMENT ............................................................................................................................ 5

I.    Racketeering Evidence Concerning the Defendants and 18th Street
    Members Is Admissible ............................................................................. 5

    A.    Applicable Law........................................................................... 6

    B.    Discussion ................................................................................. 11

II.    Statements Made by the Defendants, Other 18th Street Gang Members
    and Associates and Diego Vásquez are Admissible ........................................ 16

    A.    Applicable Law......................................................................... 16

    B.    Discussion ................................................................................. 19

III.    Music Videos Posted to YouTube are Admissible as Evidence of the
    Existence of 18th Street's Criminal Activity and Members ................................ 23

IV.    Evidence of Rodríguez's Statements to and Use of Violence Against
    CW-1 is Admissible................................................................................ 34

    A.    Applicable Law......................................................................... 34

    B.    Discussion ................................................................................. 36

V.    Autopsy Photographs and Body-Worn Camera Footage are Admissible............. 38

VI.    Use of Summary Evidence and Illustrative Aids................................................ 40

    A.    Applicable Law......................................................................... 40

    B.    Video Compilations Are Admissible As Summary Evidence ................. 41

    C.    Use of Illustrative Aids During Trial....................................... 44

VII.    Authentication of Video Recordings ..................................................................... 45

VIII.   The Court Should Preclude Any Evidence Introduced by the
        Defendants Seeking to Elicit Sympathy ............................................................... 48

IX.     The Court Should Preclude Any Evidence Relating to Possible
        Punishment and Collateral Consequences ............................................................ 49

X.      The Court Should Permit the Government to Recall Certain Witnesses .............. 50

XI.     The Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits
        to Be Introduced During Their Case-in-Chief ...................................................... 51

CONCLUSION............................................................................................................................. 55

## TABLE OF AUTHORITIES

Page(s)

### CASES

Bourjaily v. United States,
  483 U.S. 171 (1987)................................................................................................ 17, 18

Commonwealth v. Sosa,
  222 N.E.3d 5 (Mass. 2023) ............................................................................................ 42

Crawford v. Washington,
  541 U.S. 36 (2004)......................................................................................................... 19

Dollar v. Long Mfg., N.C., Inc.,
  561 F.2d 613 (5th Cir. 1977) ......................................................................................... 37

Harrod v. State,
  314 A.3d 415 (Md. App. Ct. 2024)................................................................................. 42

Linde v. Arab Bank, PLC,
  97 F. Supp. 3d 287 (E.D.N.Y. 2015) .............................................................................. 45

Old Chief v. United States,
  519 U.S. 172 (1997)........................................................................................................ 35

People v. Fernandez,
  210 A.D.3d 693 (N.Y. App. Div. 2022) ......................................................................... 42

Shannon v. United States,
  512 U.S. 573 (1994)........................................................................................................ 49

United States v. Ayers,
  No. 20-CR-239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) ........................... 25, 28

United States v. Baez,
  349 F.3d 90 (2d Cir. 2003) ......................................................................................... 7, 15

United States v. Bailey,
  800 F. App'x 35 (2d Cir. 2020) ...................................................................................... 13

United States v. Bakker,
  925 F.2d 728 (4th Cir. 1991) .......................................................................................... 41

United States v. Barrett,
  750 F. App'x 19 (2d Cir. 2018) ...................................................................................... 28

United States v. Basciano,
    599 F.3d 184 (2d Cir. 2010) ........................................................................ 8

United States v. Battaglia,
    No. 05-CR-774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .................................... 48

United States v. Bout,
    651 F. App'x 62 (2d Cir. 2016) ........................................................................ 45

United States v. Broomfield,
    591 F. App'x 847 (11th Cir. 2014) ........................................................................ 46

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) ........................................................................ 8, 35

United States v. Castro,
    659 F. Supp. 2d 415 (E.D.N.Y. 2009) ........................................................................ 10

United States v. Citron,
    783 F.2d 307 (2d Cir. 1986) ........................................................................ 40

United States v. Concepcion,
    983 F.2d 369, 381 (2d Cir. 1992) ........................................................................ 9

United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991) ........................................................................ 8, 35

United States v. Crawford,
    No. 23-CR-426 (JEB), 2024 WL 1908799 (D.D.C. May 1, 2024) .................................... 42, 43

United States v. Delligatti,
    No. 15-CR-491 (KBF), 2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018) .................................... 37

United States v. Desena,
    260 F.3d 150 (2d Cir. 2001) ........................................................................ 9

United States v. Diaz,
    176 F.3d 52 (2d Cir. 1999) ........................................................................ 9, 15, 18

United States v. DiNome,
    954 F.2d 839 (2d Cir. 1992) ........................................................................ 8

United States v. Dupree,
    706 F.3d 131 (2d Cir. 2013) ........................................................................ 22

United States v. Everett,
    825 F.2d 658 (2d Cir. 1987) ........................................................................ 10

United States v. Frappier,
  807 F.2d 257 (1st Cir. 1986) ................................................................................ 38

United States v. Fridman,
  974 F.3d 163 (2d Cir. 2020) ................................................................................. 47

United States v. Fuller,
  No. 23-CR-209 (CKK), 2024 WL 4880497 (D.D.C. Nov. 25, 2024) ..................................... 42

United States v. Gartmon,
  146 F.3d 1015 (D.C. Cir. 1998) ............................................................................ 35

United States v. Germosen,
  139 F.3d 120 (2d Cir. 1998) ................................................................................. 10

United States v. Gigante,
  166 F.3d 75 (2d Cir. 1998) .................................................................................. 23

United States v. Goffer,
  721 F.3d 113 (2d Cir. 2013) ................................................................................. 10

United States v. Gonzalez,
  110 F.3d 936 (2d Cir. 1997) .............................................................................. 8, 35

United States v. Gorel,
  622 F.2d 100 (5th Cir. 1979) ................................................................................ 42

United States v. Guerrero,
  882 F. Supp. 2d 463 (S.D.N.Y. 2011) ..................................................................... 50

United States v. Gupta,
  747 F.3d 111 (2d Cir. 2014) .............................................................................. 18, 20

United States v. Harris,
  491 F.3d 440 (D.C. Cir. 2007) ............................................................................. 49

United States v. Herron,
  No. 10-CR-615 (NGG), 2014 WL 1871909 (E.D.N.Y. May 8, 2014) .............................. 22, 34

United States v. Herron,
  762 F. App'x 25 (2d Cir. 2019) ............................................................................ 28

United States v. Holt,
  460 F.3d 934 (7th Cir. 2006) ............................................................................ 35, 37

United States v. Hoyt,
  946 F.2d 127 (D.C. Cir. 1991) ............................................................................. 47

United States v. Hsia,
    No. 98-CR-0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) ......................................... 52

United States v. Ida,
    No. 96-CR-430 (LAK), 1997 WL 122753 (S.D.N.Y. Mar. 18, 1997) ..................................... 46

United States v. Inserra,
    34 F.3d 83 (2d Cir. 1994) .................................................................................................. 8

United States v. James,
    712 F.3d 79 (2d Cir. 2013) ............................................................................................... 18

United States v. Jones,
    299 F.3d 103 (2d Cir. 2002) ............................................................................................. 40

United States v. Jordan,
    No. 20-CR-305 (LDH), 2024 WL 343970 (E.D.N.Y. Jan. 30, 2024) ................................ 25, 28

United States v. Kahale,
    789 F. Supp. 2d 359 (E.D.N.Y. 2009) ............................................................................... 28

United States v. Kerley,
    784 F.3d 327 (6th Cir. 2015) ............................................................................................ 40

United States v. Kone,
    216 F. App'x 74 (2d Cir. 2007) ......................................................................................... 17

United States v. Konstantinovskiy,
    No. 19-CR-408 (MKB), 2024 WL 3360379 (E.D.N.Y. July 10, 2024) ................................. 20

United States v. Kurland,
    No. 20-CR-306 (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ................................. 18

United States v. Lewis,
    No. 22-10783, 2023 WL 6173459 (11th Cir. Sept. 22, 2023) ................................................ 42

United States v. Livoti,
    196 F.3d 322 (2d Cir. 1999) ............................................................................................. 16

United States v. Logan,
    419 F.3d 172 (2d Cir. 2005) ............................................................................................. 19

United States v. Maharaj,
    No. 22-171, 2025 WL 1202061 (2d Cir. Apr. 25, 2025) ....................................................... 20

United States v. Malka,
    No. 19-CR-497 (NSR), 2022 WL 1488568, at (S.D.N.Y. May 11, 2022) .............................. 18

United States v. Malpeso,
   115 F.3d 155 (2d Cir. 1997) ........................................................................ 49

United States v. Marin,
   669 F.2d 73 (2d Cir. 1982) .......................................................................... 17

United States v. Matera,
   489 F.3d 115 (2d Cir. 2007) .......................................................................... 7

United States v. Mejia,
   545 F.3d 179 (2d Cir. 2008) .......................................................................... 7

United States v. Mejia-Valez,
   855 F. Supp. 607 (E.D.N.Y. 1994) .............................................................. 39

United States v. Menendez,
   759 F. Supp. 3d 460 (S.D.N.Y. 2024) .......................................................... 43

United States v. Midyett,
   603 F. Supp. 2d 450 (E.D.N.Y. 2009) .......................................................... 13

United States v. Miller,
   116 F.3d 641 (2d Cir. 1997) .......................................................................... 15

United States v. Miller,
   641 F. Supp. 2d 161 (E.D.N.Y. 2009) .......................................................... 48

United States v. Napout,
   No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017).................................. 53

United States v. Osborne,
   739 F. App'x 11 (2d Cir. 2018) ..................................................................... 38

United States v. Payne,
   591 F.3d 46 (2d Cir. 2010) ............................................................................ 9

United States v. Pierce,
   785 F.3d 832 (2d Cir. 2015) .......................................................................... 28

United States v. Pimentel,
   346 F.3d 285 (2d Cir. 2003) ........................................................................... 9

United States v. Pitre,
   960 F.2d 1112 (2d Cir. 1992) ............................................................. 8, 16, 36

United States v. Pizzonia,
   577 F.3d 455 (2d Cir. 2009) ........................................................................... 8

United States v. Powell,
No. 21-CR-572 (EK), 2025 WL 358447 (E.D.N.Y. Jan. 31, 2025) ............................ 13, 40, 52

United States v. Prevezon Holdings, Ltd.,
319 F.R.D. 459 (S.D.N.Y. 2017) ...................................................................................... 47

United States v. Rahme,
813 F.2d 31 (2d Cir. 1987) ............................................................................................... 19

United States v. Ramirez,
894 F.2d 565 (2d Cir. 1990) ............................................................................................ 10

United States v. Rastelli,
870 F.2d 822 (2d Cir. 1989) ............................................................................................ 18

United States v. Rembert,
863 F.2d 1023 (D.C. Cir. 1988)....................................................................................... 46

United States v. Rengifo,
789 F.2d 975 (1st Cir. 1986)............................................................................................ 41

United States v. Rivera,
No. 13-CR-149 (KAM), 2015 WL 1757777 (E.D.N.Y. Apr. 17, 2015) ..................................... 34

United States v. Russo,
302 F.3d 37 (2d Cir. 2002) ......................................................................................... 18, 20

United States v. Safavian,
435 F. Supp. 2d 36 (D.D.C. 2006)................................................................................... 47

United States v. Salerno,
868 F.2d 524 (2d Cir. 1987) ............................................................................................ 19

United States v. Salim,
189 F. Supp. 2d 93 (S.D.N.Y. 2002) ............................................................................... 38

United States v. Santos,
541 F.3d 63 (2d Cir. 2008) .............................................................................................. 36

United States v. Segines
17 F.3d 847 (6th Cir. 1994) ............................................................................................. 41

United States v. Shaw,
354 F. App'x 439 (2d Cir. 2009)...................................................................................... 20

United States v. Simmons,
923 F.2d 934 (2d Cir. 1991) ....................................................................................... 18, 20

United States v. Slaughter,
    248 F. App'x 210 (2d Cir. 2007) ....................................................................... 13

United States v. Smothers,
    No. 20-CR-213 (KAM), 2023 WL 348870 (E.D.N.Y. Jan. 20, 2023) ............................ 52, 53

United States v. Stearns,
    550 F.2d 1167 (9th Cir. 1977) ........................................................................ 47

United States v. Tellier,
    83 F.3d 578 (2d Cir. 1996) ............................................................................ 18

United States v. Thai,
    29 F.3d 785 (2d Cir. 1994) ............................................................................. 9

United States v. Torres,
    435 F. Supp. 3d 526 (S.D.N.Y. 2020) ................................................................ 19

United States v. Ulbricht,
    79 F. Supp. 3d 466 (S.D.N.Y. Jan. 7, 2015) ......................................................... 37

United States v. Wainright,
    351 F.3d 816 (8th Cir. 2003) ......................................................................... 40

United States v. Watts,
    934 F. Supp. 2d 451 (E.D.N.Y. 2013) ................................................................ 49

United States v. Whittingham,
    346 F. App'x 683 (2d Cir. 2009) ...................................................................... 46

United States v. Williams,
    205 F.3d 23 (2d Cir. 2000) ........................................................................... 10

United States v. Williams,
    585 F.3d 703 (2d Cir. 2009) .......................................................................... 28

United States v. Wong,
    40 F.3d 1347 (2d Cir. 1994) ........................................................................... 7

United States v. Yousef,
    327 F.3d 56 (2d Cir. 2003) ........................................................................... 17

United States v. Yuan Li,
    No. 18-CR-302 (BMC), 2020 WL 6393038 (E.D.N.Y. Nov. 2, 2020) ............................... 39

UPS Store, Inc. v. Hagan,
    No. 14-CV-1210 (WHP), 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017) .............................. 44

Valve Corp. v. Ironburg Inventions Ltd.,
  8 F.4th 1364 (Fed. Cir. 2021) ................................................................................ 47

Verizon Directories Corp. v. Yellow Book USA, Inc.,
  331 F. Supp. 2d 136 (E.D.N.Y. 2004) .................................................................. 44

Williams v. Vahey,
  No. 20-CV-2560 (KAM), 2023 WL 130834 (E.D.N.Y. Jan. 8, 2023) .................................... 55

## STATUTES

18 U.S.C. § 922(g)(5) ............................................................................................ 1

18 U.S.C. § 924(c) ................................................................................................. 1

18 U.S.C. § 924(j) ................................................................................................. 1

18 U.S.C. § 1959 ................................................................................................... 6

18 U.S.C. § 1959(a)(1) .......................................................................................... 1

18 U.S.C. § 1959(a)(5) .......................................................................................... 1

18 U.S.C. § 1962(c) ........................................................................................... 1, 6

21 U.S.C. § 841(a)(1) ............................................................................................ 1

21 U.S.C. § 841(b)(1) ............................................................................................ 1

21 U.S.C. § 846 ..................................................................................................... 1

## RULES

Fed. R. Crim. P. 16(b) .......................................................................................... 51

Fed. R. Crim. P. 26.2 ........................................................................................... 53

Fed. R. Evid. 107 ............................................................................................ 43, 44

Fed. R. Evid. 107(a) ............................................................................................. 44

Fed. R. Evid. 107(b) ............................................................................................. 40

Fed. R. Evid. 401(a) ............................................................................................. 47

Fed. R. Evid. 401(b) ............................................................................................. 49

Fed. R. Evid. 403 ......................................................................................... 34, 36, 48

Fed. R. Evid. 404(b)(2) ................................................................................................... 10

Fed. R. Evid. 611(a) .................................................................................................. 49, 51

Fed. R. Evid. 801 ...................................................................................................... 22, 24

Fed. R. Evid. 801(c) ........................................................................................................ 16

Fed. R. Evid. 801(d)(2)(A) .................................................................................... passim

Fed. R. Evid. 801(d)(2)(E) .............................................................................................. 17

Fed. R. Evid. 802 ............................................................................................................ 17

Fed. R. Evid. 803(6) ....................................................................................................... 39

Fed. R. Evid. 901(a) ....................................................................................................... 44

Fed. R. Evid. 901(b)(1) ................................................................................................... 45

Fed. R. Evid. 1006(a) ..................................................................................................... 40

PRELIMINARY STATEMENT

The defendant Herberth Rodríguez ("Rodríguez"), also known as "Kepa," is charged in a second superseding indictment (the "Indictment") with racketeering, in violation of 18 U.S.C. § 1962(c), arising from his membership in the 18th Street gang ("18th Street" or "the Enterprise"), and three predicate acts: (1) narcotics distribution, in violation of 21 U.S.C. § 841(a)(1); (2) the attempted murder of John Doe-1, in violation of New York Penal Law ("NYPL") §§ 125.25(1), 110.00 and 20.00; and (3) conspiracy to murder Diego Vásquez and the murder of Vásquez, in violation of NYPL §§ 125.25(1), 105.15 and 20.00.  The Indictment also charges Rodríguez with conspiracy to distribute and possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B) and 841(b)(1)(D); conspiracy to murder and the murder of Vásquez in-aid-of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 1959(a)(5); possessing, brandishing and discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c); causing the death of Vásquez through the use of a firearm, in violation of 18 U.S.C. § 924(j); possession of ammunition as an alien admitted under a nonimmigrant visa, in violation of 18 U.S.C. § 922(g)(5); and the attempted murder of John Doe-1 in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5).  The Indictment also charges the defendant Elias Martínez Villanueva ("Martínez Villanueva"), also known as "Rebelde," with conspiracy to murder and the murder of Vásquez in-aid-of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 1959(a)(5), in connection with his membership in 18th Street; possessing, brandishing and discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c); and causing the death of Vásquez through the use of a firearm, in violation of 18 U.S.C. § 924(j).

The government respectfully submits this memorandum in support of its motions in limine in advance of trial, which is scheduled to begin on February 23, 2026.  The government

moves to (1) admit racketeering evidence by the defendants and other 18th Street members; (2) admit statements by the defendants, their co-conspirators and the victim, Vásquez; (3) admit YouTube videos describing the means, methods and purposes of 18th Street as evidence of the existence of the Enterprise; (4) admit evidence of Rodríguez's statements to and use of violence against CW-1; (5) admit autopsy photos of Vásquez and body-worn camera footage of the crime scene and Vásquez after he was shot; (6) admit summary evidence, including video compilations; and (7) authenticate video recordings. The government also seeks to preclude evidence (8) introduced by the defendants to elicit sympathy, and (9) relating to possible punishment and collateral consequences. Finally, the government seeks (10) permission to recall certain witnesses, and (11) an order directing the defendants to disclose Rule 16(b) discovery and trial exhibits.

As detailed below, the Court should grant the government's motions in their entirety.

BACKGROUND[1]

A.     The Enterprise: The 18th Street Gang

The defendants were active members of 18th Street, a violent transnational criminal enterprise that engages in various forms of criminal activity to benefit the gang. The defendants were members of an 18th Street "clique," or set, named "54 Tiny Locos" whose "cancha," or territory, spanned from roughly 74th to 85th Streets along Roosevelt Avenue in Queens.

---

[1]     The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial. In addition, the proffer of facts set forth in this motion as to any witness's anticipated testimony is a collection of the sum and substance of the witness's anticipated testimony and does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce through the respective witness's anticipated testimony.

18th Street had numerous rivalries with other gangs but primarily with La Mara Salvatrucha, also known as MS-13, and also with the Sureños-13 gang whose territory bordered 18th Street's territory.  These bitter rivalries had lasted for many years.  18th Street members were expected to patrol their territory for the presence of rival gang members (or anyone who posed a threat to 18th Street or its members) and to confront them in a practice sometimes referred to as "pressing," which generally involved confronting rivals on 18th Street territory and demanding to know where they came from, what gang they belong to, and lifting their shirts to look for rival gang tattoos.  By virtue of their membership in 18th Street, they were expected to assist, or back up, their fellow gang members in attacking a rival to grievously injure or even kill them.

18th Street leaders collected money from members, some of which was transferred to other members incarcerated in the United States, El Salvador, Guatemala and Honduras. Additionally, 18th Street earned money, power and respect through numerous criminal activities including assaults, shootings, drug trafficking, the production of fraudulent identification documents, extortion and the promotion of prostitution.  Money generated by 18th Street through racketeering activities was used, among other things, to financially support incarcerated or deported 18th Street members and to purchase firearms.

B.      The October 10, 2020 Attempted Murder of John Doe-1

At trial, the government expects to prove that on or about October 10, 2020, in the vicinity of Roosevelt Avenue and 83rd Street in Queens, New York, Rodríguez attempted to murder a male victim ("John Doe-1") after John Doe-1 got into a physical altercation with 18th Street gang members (the "John Doe-1 Attempted Murder").

Specifically, surveillance video footage from nearby buildings showed that at approximately 11:30 p.m., Rodríguez fired gunshots from Manuel de Dios Unanue Triangle, which is bounded by Roosevelt Avenue, 83rd Street and Baxter Avenue.  The video showed John Doe-1

3

walking on Roosevelt Avenue near 83rd Street at approximately 11:30 p.m. John Doe-1 appeared to be involved in a verbal altercation with an individual who John Doe-1 then punched and knocked to the ground. John Doe-1 then walked away and entered a red truck. Multiple individuals ran across Roosevelt Avenue towards John Doe-1's brother. John Doe-1 then got out of his truck and ran towards the group of men near 83rd Street, before running back to his truck, which he entered. Rodríguez then ran east across Manuel de Dios Unanue Triangle. John Doe-1 made a U-turn in his truck on Roosevelt Avenue and Rodríguez fired towards John Doe-1's truck, striking it multiple times.

Additional video surveillance from approximately 11:30 p.m., before the shooting, depicted Rodríguez retrieving a black handgun from a backpack below several flowerpots in front of a store located at the corner of Roosevelt Avenue and 83rd Street facing Manuel de Dios Unanue Triangle. Less than a minute later, Rodríguez returned to the flowerpots and handed an item, which appeared to be a handgun, to someone else who then retrieved the above-described backpack and followed Rodríguez.

Additional video surveillance, from approximately 11:31 p.m., depicted numerous individuals appearing to react to the shooting, by moving away quickly, and pulling people into a nearby business. Shortly thereafter, the video captured Rodríguez fleeing south on 83rd Street away from Roosevelt Avenue.

C.    The November 1, 2020 Murder of Diego Vásquez

The government expects to prove that on November 1, 2020, Rodríguez and Martínez Villanueva murdered Diego Vásquez (the "Vásquez Murder"). Specifically, around 1:20 a.m., Vásquez, who was riding in a taxi, directed the taxi driver (the "Driver") to pick up Vásquez's cousin. The Driver then proceeded to that location and his cousin joined Vásquez in the taxi.

4

During the taxi ride, Vásquez engaged in a telephone call via speakerphone with a woman ("Cooperating Witness-1" or "CW-1"), who said that she was in the vicinity of 83rd Street and Roosevelt Avenue. Vásquez then directed the Driver to go to the woman's location. Once they arrived, Vásquez's cousin got out of the taxi and returned with CW-1, and both got into the taxi with Vásquez. CW-1 and Vásquez began arguing, after which Vásquez's cousin exited the taxi, and CW-1 asked to be brought home to Broadway and Britton Avenue. The taxi then drove to Broadway and Britton Avenue and CW-1 got out of the taxi. The taxi then began driving Vásquez to another destination. Surveillance footage shows that, soon after CW-1 exited the car, while the taxi was stopped at a red light at the intersection of 81st Street and Broadway in Queens, the defendants approached the driver's side of the taxi on an electric scooter. Rodríguez then fired multiple shots at Vásquez, who was seated in the taxi's rear.

In addition to these acts of violence, the government will prove through witness testimony, physical evidence, and evidence obtained from social media and cellular phones, that members of 18th Street enriched themselves by selling controlled substances in Queens, and that Rodríguez was involved in the sale and distribution of marijuana and cocaine.

## ARGUMENT

I.    Racketeering Evidence Concerning the Defendants and 18th Street Members Is Admissible

The government expects that, in the course of presenting its case-in-chief, it will offer at trial the following categories of evidence, all of which is direct proof of and inextricably intertwined with the charged racketeering and conspiracy offenses. This evidence includes (1) incidents of violence with rival gang members (or perceived rivals), which involved the use of firearms and dangerous instruments in the years leading up to late 2020, on or near 18th Street territory, to enforce the gang's dominance and control of that area; and (2) evidence of illegal activity intended to enrich the Enterprise (including, but not limited to, the production of fraudulent

5

identification documents, extortion, drug trafficking and the promotion of prostitution) and the use of those proceeds to purchase firearms to protect the gang's territory and to financially support incarcerated 18th Street members, among other things.  The evidence is inextricably intertwined with the existence, and the means and methods, of the Enterprise, the defendants' membership and position within 18th Street and the murder and narcotics conspiracies charged in the Indictment.

### A.    Applicable Law

#### 1.    Racketeering Evidence

As detailed above, Rodríguez is charged with racketeering, conspiring to distribute cocaine and marijuana, conspiring to murder and murdering Diego Vásquez in-aid-of racketeering, and the attempted murder of John Doe-1 in-aid-of racketeering, among other things.  Martínez Villanueva is charged with conspiring to murder and murdering Diego Vásquez in-aid-of racketeering, among other things.

To prove racketeering in violation of 18 U.S.C. § 1962(c), the government must prove the existence of an enterprise, that the enterprise had an effect on interstate commerce, that the defendants were associated with or employed by the enterprise, and that they agreed to engage in a pattern of racketeering activity.

Similarly, to prove violent crimes in-aid-of racketeering in violation of 18 U.S.C. § 1959, the government must prove: (1) the existence of an enterprise engaged in or affecting interstate or foreign commerce; (2) that the enterprise was engaged in racketeering activity; (3) that the defendants had or were seeking a position in the enterprise; (4) that the defendants committed the alleged violent crime; and (5) that the defendants' general purpose in committing the violent crime was to maintain or increase their position in the enterprise.

6

It is well established that evidence of "other" or "uncharged" crimes—including, among other violent conduct, murders—is admissible as direct proof in racketeering cases, without reliance on Federal Rule of Evidence 404(b), because such evidence is necessary to prove the existence of such an enterprise.  See, e.g., United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) ("It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise.").  For example, in United States v. Mejia, the Second Circuit explained that evidence of an uncharged shooting and narcotics trafficking by MS-13 was properly admitted to establish the "existence of a racketeering enterprise."  545 F.3d 179, 206 (2d Cir. 2008).  As the Court held, "evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated."  Id. (internal quotation marks omitted).

Likewise, in United States v. Matera, the Second Circuit approved the admission of uncharged murders committed by members of the Gambino Family, including by non-defendants, as direct evidence because it was "offered to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated."  489 F.3d 115, 120 (2d Cir. 2007); see also United States v. Wong, 40 F.3d 1347, 1377-78 (2d Cir. 1994) (finding that the district court properly admitted testimony of an uncharged shootout between rival gangs because the "evidence was probative of the existence, organization, and nature of the RICO enterprise, a central allegation in the indictment").

It is also well-established that a prior act is admissible as direct evidence—i.e., not "other crimes" evidence under Rule 404(b)—if it arose "out of the same transaction or series of

7

transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (finding that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.") (citations omitted); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between participants in the crime developed.").

Uncharged crimes are also admissible as direct evidence of the pattern of racketeering activity, even if the defendant did not participate in those crimes. Such evidence "can constitute some evidence of the nature of the enterprise, which, in turn, can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO." United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (internal quotations and citation omitted); see also United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of violent activities engaged in by other members and associates of the DeMeo Crew, including uncharged murders, are relevant because they tended to prove: "(i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities"); cf. United States v. Pizzonia, 577 F.3d 455, 465 (2d Cir. 2009) ("Although no [fewer]

8

than two predicate acts must be committed . . . to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern." (internal citation and quotation marks omitted)).

Finally, with respect to the motive requirement for violent crimes in-aid-of racketeering, the Second Circuit has explained that it may be proved in various ways:

> In order to establish that a crime of violence was committed for the purpose of . . . maintaining or increasing position in a RICO enterprise, the government is required to prove, inter alia, that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise. . . . Self-promotion need not have been the defendant's only, or even his primary, concern, if it was committed as an integral aspect of membership in the enterprise. United States v. Concepcion, 983 F.2d [369,] 381 [(2d Cir. 1992)]. The motive requirement is thus satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership. Id.

United States v. Thai, 29 F.3d 785, 817-18 (2d Cir. 1994) (some citations omitted); see also United States v. Payne, 591 F.3d 46, 63 (2d Cir. 2010) ("'[T]he motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" (quoting United States v. Pimentel, 346 F.3d 285, 295-96 (2d Cir. 2003)); United States v. Desena, 260 F.3d 150, 155 (2d Cir. 2001); United States v. Diaz, 176 F.3d 52, 95 (2d Cir. 1999); Concepcion, 983 F.2d at 381.

Under Thai and its progeny, the nature of the charged enterprise, the rules and structure of that enterprise, and the expectations of membership are all relevant to proving whether a defendant committed a violent crime with the purpose of "maintaining or increasing position"

within the enterprise.  See, e.g., United States v. Castro, 659 F. Supp. 2d 415, 421 (E.D.N.Y. 2009) (concluding in Section 1959 prosecution that evidence of an uncharged shooting was admissible to prove the motive for a charged shooting where the motive behind both shootings was to "harm members of rival gangs").

## 2.  Rule 404(b) Evidence

In the alternative, evidence of uncharged crimes and other acts may be admitted pursuant to Rule 404(b) for numerous permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid. 404(b)(2).  The Second Circuit has repeatedly held that evidence of uncharged crimes may be admitted at trial under Rule 404(b) to establish the existence and development of a criminal relationship between co-conspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence of defendant's prior criminal activities with co-conspirators in charged drug conspiracy as relevant "to inform jury of the background of the charged conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed").  Other acts evidence is also admissible under Rule 404(b) to "corroborate crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant."  United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted).

Finally, acts that occurred after the charged conduct are also admissible under Rule 404(b).  See, e.g., United States v. Goffer, 721 F.3d 113, 124 (2d Cir. 2013) ("Subsequent acts are frequently probative as to intent"); United States v. Germosen, 139 F.3d 120, 128 (2d Cir. 1998) ("The fact that the evidence involved a subsequent rather than prior act is of no moment.  'Subsequent act' evidence may be admitted under Rule 404(b)."); United States v. Ramirez, 894

F.2d 565, 569 (2d Cir. 1990) ("Relevancy cannot be reduced to mere chronology; whether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility.").

> B.    Discussion

> 1.    Violent and Criminal Acts by the Defendants and Other 18th Street Members are Admissible

The government expects to prove that 18th Street members committed and attempted to commit "acts of violence, including acts involving murder and assault, to enhance the Enterprise's prestige and to protect and expand the Enterprise's criminal operations." See Indictment ¶ 7(a). They also "used and threatened to use physical violence against various individuals, including members of rival organizations." Id. ¶ 7(b).

As detailed above, the government will prove that 18th Street members were expected to watch over their territory, confront rivals, and assist fellow gang members in attacking rivals, including by killing them. For instance, the government will introduce evidence at trial through witness testimony and/or surveillance video that, on or about August 14, 2020, a group of 18th Street members approached a victim ("Victim-1"), who they believed to be a Sureños-13 gang member, near the intersection of 82nd Street and Roosevelt Avenue after Victim-1 passed them on the street. They asked Victim-1 where he was from, and Victim-1 reacted by brandishing a gun towards the 18th Street members. At that point, one of the 18th Street members left the group to retrieve a gun, returned to the scene and fired multiple times at Victim-1 shooting him once in the shin. Responding evidence collection officers recovered two discharged A-MERC 9mm shell casings and a live 9mm cartridge near the intersection of 81st Street and Roosvelt Avenue.

11

Two months later, on October 10, 2020, as charged in the Indictment, Rodríguez shot multiple times at John Doe-1 and struck his truck near the corner of Roosevelt Avenue and Baxter Avenue—less than two blocks from the prior shooting. Responding evidence collection officers recovered two discharged A-MERC 9mm shell casings near the shooting scene. Subsequent ballistic testing confirmed that the same firearm was used in both shootings.[2] This conduct forms the basis of Racketeering Act Two (attempted murder of John Doe-1) and Count Eight (attempted murder in-aid-of racketeering of John Doe-1). The government intends to prove that Rodríguez's motivation for shooting John Doe-1 was to defend 18th Street members who had been involved in an altercation with John Doe-1.

In addition to those violent confrontations, the government intends to establish at trial through multiple forms of evidence, including through testimony from one or more cooperating witnesses, law enforcement witnesses, civilian witnesses and/or surveillance video, that the defendants were involved in several acts of violence, including the following:

- Evidence that on or about Halloween 2019, Rodríguez and other 18th Street members confronted rival gang members on Roosevelt Avenue. One of the rivals was chased and beaten by 18th Street members as Rodríguez fired at another rival but his gun jammed.

- Evidence that in mid-2020, an 18th Street member got into a verbal altercation with someone that the member believed was trying to rob him. Martínez Villanueva responded by retrieving a bat that 18th Street members hid near a business establishment on Roosevelt Avenue and menaced that individual with the bat as Martínez Villanueva chased him for several blocks.

- Evidence that in mid-August 2020, Rodríguez and at least two other 18th Street members surrounded a group of approximately 3-4 black males near 83rd Street

---

[2]     On January 13, 2022, police officers with the NYPD recovered a 9mm firearm from a residential location in Queens as part of an unrelated investigation. A microscopic examination of test fires from that gun against the ballistic evidence from the shootings in August 2020 and October 2020 confirmed that the 9mm firearm was the same gun used in both shootings. The government intends to introduce limited testimony from law enforcement officers about the recovery of the firearm.

12

and Roosevelt Avenue who they believed to be members of a rival gang and assaulted and shot at one of the victims.

- Evidence that in or about September 2020, Rodríguez shot a victim ("Victim-2") multiple times near Britton Avenue in Queens, a location within 18th Street territory and several blocks from Rodríguez's residence.

- Evidence that on an unspecified date, Rodríguez fired approximately once at members of a rival gang known as the "Vatos Locos," a rival 18th Street clique, near a bar on 77th or 78th Street in Queens because members of the Vatos Locos threatened to kill members of Rodríguez's clique, the 54 Tiny Locos.

Evidence of access to firearms by the defendants and 18th Street members is also admissible as direct evidence of the charged offenses because it proves that 18th Street members had communal access to guns, which they exchanged between members of the gang to protect themselves and their territory and fight enemies, including during the two charged acts of murder and attempted murder.  See, e.g., United States v. Bailey, 800 F. App'x 35, 37 (2d Cir. 2020) (noting that the Second Circuit "has regularly affirmed the admission of firearms possession to establish that the defendant had the opportunity to access firearms."); United States v. Slaughter, 248 F. App'x 210, 212 (2d Cir. 2007) ("Evidence showing that a defendant possessed a handgun prior to the charged crime is properly admitted to show access to such a weapon."); United States v. Powell, No. 21-CR-572 (EK), 2025 WL 358447, at * 2 (E.D.N.Y. Jan. 31, 2025) (noting that evidence of firearms possession may be admissible because it "tend[s] to establish that firearm sales or exchanges demonstrate a relationship of trust between defendants."); United States v. Midyett, 603 F. Supp. 2d 450, 459 (E.D.N.Y. 2009) (admitting evidence of gun possession when the "gun involved in the uncharged possession is the same or similar to the gun involved in the charged offense.").

As noted above, the government also expects to prove that 18th Street members frequently hid firearms in bags or backpacks that they exchanged amongst themselves and secreted

other weapons, such as guns, bats, machetes and metal chains, in hidden locations along 18th Street territory so that any of the members could quickly access those items in the event a rival came onto their territory. For instance, on one occasion, Rodríguez hid a gun in a newspaper stand near 81st Street and Roosevelt Avenue. On April 13, 2020, law enforcement agents recovered a loaded 9mm pistol[3] from a yellow "El Especialito"[4] newspaper box on 81st Street and Roosevelt Avenue.

2.      Evidence That 18th Street Members Engaged in Various Types of Illegal Activity to Enrich Itself

At trial, the government will introduce evidence that the defendants and other 18th Street members and associates "used, attempted to use and conspired to use narcotics trafficking, production of fraudulent identification documents and extortion as means of obtaining money." See Indictment 7(c). In addition to these activities, members of 18th Street also promoted prostitution by soliciting clients on and around Roosevelt Avenue and taking them to brothels in 18th Street territory. Specifically, the evidence at trial will establish that 18th Street enriched itself by selling controlled substances, including cocaine and marijuana; manufacturing and distributing fraudulent identification documents, including, but not limited to, driver's licenses, green cards, and Occupational Safety and Health Administration (OSHA) cards; and extorting the owners of brothels for cash payments in exchange for permitting them to run those brothels. 18th Street also

---

[3]      A subsequent operability analysis revealed that the gun was a blank pistol, which is a firearm designed to fire blank cartridges that contain gunpowder but no bullet. When fired, these guns produce a loud sound and a muzzle flash, mimicking a real firearm, but they are non-lethal and incapable for firing live ammunition. However, the ammunition recovered from the firearm was determined to be operable and capable of being fired from a real gun.

[4]      "El Especialito" is a Hispanic weekly newspaper based in New York and New Jersey.

14

"collected money from members, some of which was transferred to other members who were incarcerated in the United States, El Salvador, Guatemala and Honduras."  See Indictment ¶ 1.

The government will further present evidence that 18th Street maintained a tight grip over its territory and illegal activity within that location and extorted individuals (who were not 18th Street members) for "rent" money, or demands for payment through threats or coercion, to permit them to sell drugs, operate brothels and distribute fraudulent identification documents. The consequence for not paying "rent" to 18th Street could lead to a violent assault or even death. The government also intends to introduce evidence that the proceeds of extortion and illegal conduct were used by 18th Street members to purchase weapons, such as firearms, implements to manufacture fraudulent identification documents, and to financially support incarcerated members of the gang, among other things.

This evidence is admissible as direct evidence of the charged offenses.  See Baez, 349 F.3d at 93; Diaz, 176 F.3d 52 at 79 (admission of uncharged acts of drug trafficking, weapons stockpiling, and acts of violence were appropriate as "it tended to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant-appellant"); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (evidence "of numerous killings by" members of racketeering enterprise properly admitted "as proof of the existence of the RICO enterprise alleged in the indictment which used such acts of violence in furtherance of its narcotics conspiracy").

Each of the above categories of proffered evidence is highly relevant and probative of the charged crimes, and the defendants will not be unfairly prejudiced by the admission of such evidence.  Specifically, because the proffered evidence does "not involve conduct any more sensational or disturbing" than the offenses charged—including the exceptionally violent murder

15

of Vásquez and the attempted murder of John Doe-1—there is no risk of unfair prejudice as to the proffered evidence.  See Pitre, 960 F.2d at 1120;  accord United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (evidence of uncharged acts not unfairly prejudicial when it does not involve conduct "more inflammatory than the charged crime").

II.    Statements Made by the Defendants, Other 18th Street Gang Members and Associates and Diego Vásquez are Admissible

At trial, the government intends to introduce statements made by the defendants and other 18th Street members and associates concerning (1) the Vásquez Murder and the John Doe-1 Attempted Murder, and (2) other racketeering activity, including but not limited to violent acts, narcotics trafficking, the production of fraudulent identifications, extortion, the promotion of prostitution and other crimes.  For the reasons set forth below, these statements are admissible as, among other things, statements of a party opponent and/or coconspirator statements.  See Fed. R. Evid. 801(d)(2)(A) & (E).[5]  The government also intends to introduce non-hearsay statements made by Vásquez prior to his murder.

A.    Applicable Law

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c). "Hearsay is not

---

[5]    The statements outlined herein are representative of those the government intends to introduce at trial as direct evidence.  The statements included here are not exhaustive, and the government intends to introduce as evidence statements of a similar nature that are not outlined here.

16

admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802.

### 1.      Adverse Party Admissions

Not all out-of-court statements offered for their truth are hearsay.  First, out-of-court statements made by a defendant are not hearsay when introduced by the government in a criminal trial to prove the truth of the facts stated therein because they are admissions of an adverse party.  See Fed. R. Evid. 801(d)(2)(A) (a statement offered against an opposing party that "was made by the party in an individual or representative capacity" is not hearsay); United States v. Kone, 216 F. App'x 74, 76 (2d Cir. 2007) ("Statements made by the defendant, where relevant, may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.").  In sum, where a defendant's out-of-court statement is relevant and has probative value not substantially outweighed by countervailing factors, it should be admitted.[6]

### 2.      Co-conspirator Statements

Rule 801(d)'s exception to the exclusion of hearsay applies not only to statements "made by the party" himself, but also permits statements "made by the party's co-conspirator during and in furtherance of the conspiracy." See Fed. R. Evid. 801(d)(2)(E).  Three requirements apply for the admission of co-conspirator statement: (1) a conspiracy existed; (2) the declarant and the defendant against whom the statement is offered were members of the conspiracy; and (3) the statements were made in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171,

---

[6]      It bears noting that a defendant does not have a parallel ability to offer his or her own statements: "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." United States v. Marin, 669 F.2d 73, 87 (2d Cir. 1982); see also United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003).

17

176 (1987). Each of these elements need only be proven by a preponderance of the evidence. Id. at 175-76.

As to the first and second requirements, the conspiracy in which the defendant and the declarant are engaged "need not be the crime charged in the indictment" for the statements to be admissible. United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002). It is sufficient that the defendant and the declarant were in a conspiracy together. Id. While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." Diaz, 176 F.3d at 83 (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

The third requirement—that the statement be made "in furtherance of" the conspiracy—is "not very restrictive." United States v. Kurland, No. 20-CR-306 (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022) (quoting United States v. Malka, No. 19-CR-497 (NSR), 2022 WL 1488568, at *13 (S.D.N.Y. May 11, 2022)). The breadth of the concept is evident in the variety of theories that have been affirmed. For example, statements are admissible that prompt the listener "to respond in a way that promotes or facilitates the carrying out of a criminal activity." See, e.g., United States v. James, 712 F.3d 79, 106 (2d Cir. 2013). So are those "that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy." United States v. Gupta, 747 F.3d 111 (2d Cir. 2014) (quoting United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991)). Statements that inform a co-conspirator "of the identity and activities of his co-conspirators" are likewise admissible. United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989).

Under these standards, "statements about acts committed in the course of the racketeering conspiracy will generally be admissible if they are designed to 'apprise a co-

18

conspirator of the progress of the conspiracy.'" United States v. Torres, 435 F. Supp. 3d 526, 532 (S.D.N.Y. 2020) (quoting United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987)); see, e.g., United States v. Salerno, 868 F.2d 524 (2d Cir. 1987) (statements made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).

The Second Circuit has noted that, "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial." United States v. Logan, 419 F.3d 172, 178 (2d Cir. 2005). Accordingly, the admission of co-conspirator statements generally does not pose Confrontation Clause concerns. See id.; see also Crawford v. Washington, 541 U.S. 36, 56 (2004) ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.").

> B.    Discussion
>
> 1.    Statements by the Defendants and Other 18th Street Members and Associates Concerning the Vásquez Murder and the John Doe-1 Attempted Murder

The government intends to introduce communications in which the defendants spoke to each other and other 18th Street members and associates before and after the Vásquez Murder;[7] testimony from CW-1 about statements made by Rodríguez to CW-1 before and after the Vásquez Murder; statements made by Rodríguez about the John Doe-1 Attempted Murder; and

---

[7]    For instance, in one particular text exchange between the defendants, which took place on November 2, 2020—the day after the Vásquez Murder—they referenced a Telemundo news broadcast that covered the shooting. The government has provided the defendants with a certified copy of this news broadcast from NBC Universal, a draft translation and a business records certification indicating that this news story aired on November 2, 2020 on the 6:00 p.m. and 11:00 p.m. newscasts. The government intends to introduce the video, the certification and a certified translation of the video into evidence to contextualize and corroborate the text exchange between the defendants. The government will confer with defense counsel with respect to the specific portions it intends to use at trial.

19

statements made by other 18th Street members following the Vásquez Murder and other violent actions taken in furtherance of the gang.  Statements made by the defendants are plainly admissible as statements of an adverse party and, independently, as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(A) & (E);  see also United States v. Russo, 302 F. 3d 37, 43 (2d Cir. 2002).

Statements made by other 18th Street members and associates about the defendants' involvement in violent crimes, including the Vásquez Murder, are admissible as co-conspirator statements because they furthered the goals of the 18th Street gang by promoting cohesiveness, apprising fellow members of the status of the conspiracy and its goings on, and served as a warning and disruption to 18th Street's usual criminal activities due to potential police presence.  See United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991) ("We have recognized that statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy, further the ends of a conspiracy" (cleaned up)); United States v. Gupta, 747 F.3d 111, 124 (2d Cir. 2014);  United States v. Maharaj, No. 22-171, 2025 WL 1202061, at *2 (2d Cir. Apr. 25, 2025)  ("The testimony thus helped the jury to understand the formation of the conspiracy, how Maharaj and Rubano came up with the scheme, why they trusted one another, and how Ekemen was induced to continue participating in the conspiracy."); United States v. Konstantinovskiy, No. 19-CR-408 (MKB), 2024 WL 3360379, at *16 (E.D.N.Y. July 10, 2024); see also United States v. Shaw, 354 F. App'x 439, 443 (2d Cir. 2009) ("We have no difficulty in concluding that statements during a discussion between members of the Two Mile Posse while discussing murders carried out by a different subset of the Two Mile

20

Posse could 'serve to foster trust and cohesiveness, or inform each other as to the progress or status of a conspiracy.'").

For instance, the government expects to introduce evidence at trial establishing that, shortly after the Vásquez Murder, one of the leaders of the 54 Tiny Locos clique of 18th Street named "Chabelo" told other 18th Street members that the defendants had committed the murder together and showed them a video of the shooting depicting a motorcycle pulling up alongside a taxi and opening fire.

Statements concerning the violent activities of 18th Street and, in particular, the charged murder and attempted murder, are highly probative as the statements support the defendants' involvement in and motive for committing the shootings. Additionally, statements made by 18th Street members following the charged conduct are relevant because they demonstrate how members of the gang apprised one another of illegal conduct committed by other confederates, which would require increased vigilance on their part to prepare for scrutiny by law enforcement or possible retaliation by rival gangs. Nor are these statements overly prejudicial or inflammatory given that the statements concern the charged conduct.

> 2. Statements by the Defendants and Other 18th Street Members and Associates Concerning Racketeering Activity

Statements by the defendants and other 18th Street members and associates concerning racketeering activity, including statements about uncharged violent acts, narcotics trafficking, access to firearms, other illegal activities of the gang, as well as the general rules and expectations of 18th Street members are equally admissible pursuant to Fed. R. Evid. 801(d)(2)(A) & (E). Specifically, the government intends to introduce evidence of the defendants' own statements as well as statements made by other 18th Street members and associates concerning crimes in furtherance of the gang including drug trafficking. The government intends to introduce

21

this evidence through text messages and other electronic and recorded communications and testimony from cooperating witnesses. As described above, these statements are plainly admissible as adverse party statements and co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(A) & (E). These statements are also highly probative of the charged racketeering enterprise and violent acts committed by the defendants and provide critical evidence about the existence of the Enterprise. Thus, the probative value of the evidence far outweighs any potential prejudice given that the statements are not more gruesome than the crimes with which the defendants are variously charged—racketeering and murder. United States v. Herron, No. 10-CR-615 (NGG), 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014) ("In this circuit, evidence is not unduly prejudicial when it is not 'more inflammatory than the charged crime[s]'") (citation omitted).

### 3. Statements by Vásquez Prior to His Murder

Statements by Vásquez in the hours before his murder regarding his membership in the rival MS-13 gang and his belief that members of 18th Street had targeted him for death are admissible as any such statement would not be offered for the truth of the matter asserted, and therefore is not hearsay. Pursuant to Federal Rule of Evidence 801(c), "hearsay" means a statement that the declarant does not make while testifying at the current trial *and* a party offers in evidence to prove the truth of the matter asserted in the statement. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801, Advisory Committee Notes; see also United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013).

Specifically, the government intends to introduce Vásquez's statements concerning his membership in MS-13 including, for example, statements referencing his affiliation with MS-

22

13, statements confronting CW-1 about her luring him to 18th Street gang territory because of his membership in MS-13, and statements that Vásquez believed he was being targeted by 18th Street on the evening of his murder because of his gang affiliation.  These types of statements are not hearsay because the government is not offering them for their truth—i.e., that Vásquez was actually in MS-13—but to show that the defendants (and other 18th Street members and associates) believed that Vásquez was a member of a rival gang and that the motive for the shooting was gang-related.

III.    Music Videos Posted to YouTube are Admissible as Evidence of the Existence of 18th Street's Criminal Activity and Members

At trial, the government intends to introduce, through video and audio recordings, statements made by 18th Street members or associates during the lead up to acts taken on behalf of the Enterprise or while those acts—including attempted and completed acts of violence—were being committed.  As stated above, co-conspirator statements are admissible under Rule 801(d)(2)(E), which excludes from the definition of hearsay "statement[s] by a co-conspirator of a party during the course and in furtherance of the conspiracy."  See United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1998).  Further, out-of-court statements made by the defendants are not hearsay when introduced by the government because they are admissions of an adverse party.  See Fed. R. Evid. 801(d)(2)(A).  Because these statements were, among other things, "designed to promote or facilitate achievement of the goals of the conspiracy," they are admissible under Rule 801(d)(2)(E).

Specifically, the government seeks to introduce statements made by 18th Street members or associates in three music videos posted to YouTube in March, May and November

2020—the months prior to and during the charged offenses.[8]  Each video, which was publicly posted to YouTube, is between four and six minutes in length.  In addition to the audio within the music videos, the government seeks to admit the visual depictions within the videos, which include photos of 18th Street members together (some of which include the defendants), depictions of 18th Street territory (i.e., Roosevelt Avenue from 74th to 85th Streets), and 18th Street hand signs, tattoos, clothing, and graffiti, among other things.[9]  At trial, the government must prove the existence and nature of the Enterprise, including, among other things, that 18th Street made efforts to "promot[e] and enhance[e] the prestige, reputation and position of the Enterprise" in the community.  See Indictment ¶ 6.  Therefore, unlike in some cases, the existence of this Enterprise and the nature in which members promoted themselves is central to the government's proof at trial.  One meaningful way that 18th Street promoted its reputation within the community was by posting music videos on a public platform which describe and depict 18th Street, the role of the members, threats of violence to rivals and others who start problems with 18th Street, threats of retaliatory violence, and rivalries between 18th Street and MS-13.  See id.  Indeed, as alleged in the Indictment, the government must prove, among other things, that purposes of the Enterprise

---

[8]     The titles of the three songs—"NY Representando – Chemo," "Roosevelt Subiendole al Nivel – Chemo BEST," and "BEST 82BLOKE TLSNY CHEMO"—themselves reference the territory of the charged Enterprise and 18th Street members, and are thus also admissible to show the existence of the Enterprise.  Specifically, the government intends to establish at trial that "Roosevelt" and "82" are references to 18th Street's territory, which is roughly located on Roosevelt Avenue between 74th to 85th Streets in Queens, New York.  The government also expects to establish that "Chemo" was a member of the 54 Tiny Locos clique of 18th Street in Queens and that, after being deported to Mexico, he continued his involvement with 18th Street in Mexico.  Thus, the names of the music videos are relevant to the charged conduct and are also admissible.

[9]     To the extent the defendants object to certain excerpts or images depicted in the music videos, the government will confer with defense counsel as to whether appropriate redactions can be made.

24

included promoting and enhancing prestige and reputation with respect to rival criminal organizations, and keeping victims and rivals in fear of the Enterprise through intimidation and acts and threats of violence.  See Indictment ¶ 6.  Therefore, as the below-described lyrics and videos specifically describe the Enterprise and its means and methods, they are admissible.  See United States v. Jordan, No. 20-CR-305 (LDH), 2024 WL 343970, at *4 (E.D.N.Y. Jan. 30, 2024) (holding that the relevance of rap lyrics at trial evidence depends on the existence of a specific factual nexus between the content of rap music and the crimes alleged, and excluding general rap lyrics in a non-racketeering context); United States v. Ayers, No. 20-CR-239 (BMC), 2024 WL 1158686, at *7 (E.D.N.Y. Mar. 18, 2024) (admitting lyrics in a racketeering case where they allude to a specific criminal motive tied to one of the allegations in the case, namely to kill a rival, and excluding lyrics that were too general or amounted to "vapid posturing").

The government seeks to admit the below categories of statements by 18th Street members and associates:[10]

- Statements discussing the existence of 18th Street, including the existence of the 54 Tiny Locos clique and the role and expectations of 18th Street members.  See, e.g., Ex. A-1 at 2 (text on screen says "18 St New York Representing"); 2 ("You know we out here tatted, 18th Street"); 3 ("New York representing, 82nd still loud on the scene"); 3 ("We're still holdin' the reins, keepin' the hood connected"); 3 ("if you shoot, I'm quick with the assist. And if you run off, you might just end up where my clip extends"); 3 ("I'm just chillin', scopin' out the hood 'cause some fools act bold where there's no need"); 5 ("Now we're here, the crew all lit off that weed, we repping, we run things, brotherhood so strong, you can see it."); Ex. A-2 at 3 ("You know what's up, my brother, when a guy hits the street, weed style, the crew starts wildin', and Roosevelt gets dangerous" and text on screen says "NY Representing"); 5 ("You know I rep my big numbers. 1-8, sending greetings from behind bars. We're still here. We're not leaving, you already know we rep and die for 82. We multiply. I've seen big dogs rise up and fall down"); 5 ("To all the Roosevelt homies, 18 on top, you're 18 to the core, your life is in the line"); Ex. A-3 at 2 (text on screen says "18st 82th Bloke 54TLS NY" and "54 Tiny Locos N.Y.

---

[10]    The government attaches draft transcripts (subject to revision) as Exhibits A-1, A-2, and A-3, and the videos themselves as Exhibits B-1, B-2, and B-3.  The videos were previously produced to the defendants at HR000462, HR000461, and HR000460.

Chemo," which are references to the 54 Tiny Locos clique within 18th Street); 2 ("Big ups to all my TLS homies; straight up 18. We've got respect. And we've got control, too. If you clash with these dudes, your life is over"); 2 ("Soldiers without fear, watching the sidewalk"); 4 (text on screen says "Stay alert homies").

- Statements referencing the specific territory of the 54 Tiny Locos clique of 18th Street, which the government anticipates will be established at trial as Roosevelt Avenue in Queens, New York from roughly 74th to 85th Streets, and specific areas in Mexico in which the clique also operates. See, e.g., Ex. A-1 at 3 ("New York representing, 82nd still loud on the scene"); 4 ("Fought my wars on 82nd, and I stand on my word"); Ex. A-2 at 2 ("Here comes the train, and danger's on the track. The Beast is ridin' high, repping for life. That's 82nd — may God bless her" with "Welcome to Queens" text on screen); 2 ("Rollin' it up in paper, on Roosevelt"); 3 ("Under the 7 train, dudes have fun, cholos, they turn into death"); 5 ("We're not leaving, you already know we rep and die for 82"); 3 ("18 from Puebla to California"); 5 ("To all the Roosevelt homies, 18 on top, you're 18 to the core, your life is in the line"); Ex. A-3 at 2 (text on screen translates to "82th Bloke That Chemo"); 5 (text on screen translates to "New York Roosevelt"); 7 (text on screen says "Chabelo").[11]

- Statements discussing the members and associates of 18th Street, including references to members of 18th Street such as "Chabelo," one of the leaders of the 54 Tiny Locos clique in Queens; and other members, such as "Chemo," "Menor," "Micro," "Pantera," "Conejo," "Pequeña," and "Chapulín." See, e.g., Ex. A-1 at 3 ("I'm rollin' with Menor"; "Conejo and Pequeña have been runnin' things for a while"; "Chabelo out on 18, holdin' it down and clean"); 5 ("Micro and Pantera shooting"; "Here goes a firm salute, my homie Chapulín"); Ex. A-2 at 6 (text on screen spells "Chemo"); Ex. A-3 at 2, 3, 5 (text on screen spells "Chemo"); 4 ("Devil Engineer and me, Chabelo"); 6 ("What's good, homie Chemo? You tell me what's next").

- Statements discussing 18th Street signs and symbols used by members and associates to identify each other and represent the gang and their territory. See, e.g., Ex. A-1 at 3 ("taggin' 18 on the walls"); 3 ("throwin' up that XVIII[12] [sign]");

---

[11]   As noted above, this also includes the titles of the songs, including "Roosevelt Subiendole al Nivel – Chemo BEST," which translates to "Roosevelt rising up to the level," and "BEST 82BLOKE TLSNY CHEMO," which the government anticipates will be established as a reference to 82nd Street and the 54 Tiny Locos clique.

[12]   The most commonly used symbols for 18th Street are XVIII, XV3, X8 and 666, all of which add up to 18. Other symbols include 99, which also adds up to 18, and 3-dots, which represent "Mi Vida Loca," a reference to the violent lifestyle associated with the 18th Street gang.

4 (text on screen is "BEST[13] Represent," and the government anticipates it will establish that "BEST" is a reference to 18th Street); A-2 at 2 ("Holdin' the emblem high, 18's takin' over your system. This track is my motto, always ready if there's a problem"); 5 ("Hands up, "Es" up"); A-3 at 2 (text says "E gang or don't bang Y"); 2 ("You know what's up with the 5th letter [E]"); 5 ("Bald and tatted up, may your style never die"); 5 (text on screen says "Shoutout to the Street XV3").

- Statements discussing 18th Street's specific rivalries and acts and threats of violence against rival gang members (see Indictment ¶ 6), including the Enterprise's rivalry with MS-13.  The government anticipates it will establish at trial that members of 18th Street derisively referred to MS-13 by using derogatory words starting with "M" and followed by "S", such as "mierda seca" (which translates to "dried shit").  See, e.g., A-1 at 5 ("My pops is still prayin' while I'm out here running down foes. Micro and Pantera shooting. People screamin', and Santa Muerte [Holy Death] is watchin' while the homies finish what we started"); Ex. A-2 at 2 ("My enemy, you know that nothing compares to me, don't know why they wanna play with a gun and bullets"); 3 ("Fuck MS, fuck the cops too, we rep what we rep"); 4 ("But if I see you on the turf, you know I'm gonna shoot"); 5 ("Killing MS has become my job"); 5 ("We're still here in the area, taming the opposition."); Ex. A-3 at 3 ("You want trouble? Go ahead. Earn that respect. It's not worth going up against a hood full of homies."); 3 ("Don't worry because retaliation is in my game. With a .38, I roll solid, reppin' X8, so the whole world knows 18 is here.  My gun and my balls are ready for my enemy if he wants to test me. Pack of MS assholes" with "Respect Unity Revenge" text on screen); 4 ("Outlaw, with skill and all the violence. My mind only thinks about kicking your jaw, you ain't worth shit, so you better think twice before acting tough and stepping into this jungle"); 5 ("There's no truce here, and definitely no equals. If you cross paths with this pirate, you're done for."); 5 ("When the shooting starts, I get harder, I say a prayer to Santa Muerte [Holy Death] and grab a gun"); 7 ("I have my scapulary and insane backup for any rival punk who thinks he's too tough").

- Statements discussing 18th Street's criminal activity to enrich the Enterprise, including "narcotics trafficking" (see Indictment ¶ 7). See, e.g., Ex. A-2 at 3 ("If you're smokin' that green, I'm smokin' the good stuff.  If you're sniffing coke, don't play dumb 'cause I'm the one who used to sell it to you").

For the reasons discussed below, the proffered statements within the music videos posted on YouTube, as well as the accompanying video depictions, are admissible at trial because they provide "context and dimension to the government's proof of the charges."  See United States

---

[13]    The term "BEST" is a gang identifier and acronym used by 18th Street, which stands for "Barrio Eighteenth Street."

27

v. Kahale, 789 F. Supp. 2d 359, 381 (E.D.N.Y. 2009) (quoting United States v. Williams, 585 F.3d 703, 707 (2d Cir. 2009)).

The Second Circuit has approved the admission of music lyrics at trial to establish the existence of a charged racketeering enterprise. See United States v. Pierce, 785 F.3d 832, 841 (2d Cir. 2015) (holding that music videos were properly admitted under Rule 403 where the "government proffered the rap video to show [the defendant's] animosity toward the Young Gunnaz, as well as his association with" the enterprise); see also United States v. Herron, 762 F. App'x 25, 30 (2d Cir. 2019) (rap videos properly admitted where "used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise"); United States v. Barrett, 750 F. App'x 19, 22 (2d Cir. 2018) (music videos admissible to show association with co-conspirators and use of vehicle used in charged crimes). As with other evidence, "[r]ap lyrics . . . are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." Pierce, 785 F.3d at 841. When evaluating whether songs or song lyrics are relevant and admissible, courts in this Circuit consider whether there is "a specific factual nexus between the content of rap music and the crimes alleged." Jordan, 2024 WL 343970, at *4; see also Kahale, 789 F. Supp. 2d at 381 ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."). Rap lyrics that speak to, among other things, specific criminal motive tied to the charges, relevant geographical locations and names, and other specific facts relevant to issues presented in the case have been found admissible. See, e.g., Ayers, 2024 WL 1158686, at *7 (admitting lyrics in a racketeering case where they allude to a specific criminal motive tied to one of the allegations in the case, namely to kill a rival, and excluding lyrics that were too general or amounted to "vapid posturing"); United States v. Forney, No. 24-

28

CR-146 (KAM) (E.D.N.Y.  Aug. 4, 2025) (admitting lyrics in a sex trafficking case that reference a specific location where the defendants brought victims to engage in sex work; "knowing the rules," which is a reference to rules between prostitutes and pimps; and the defendant's nickname, among other things); United States v. Miller, No. 20-CR-331 (E.D.N.Y. May 7, 2024) (admitting rap lyrics in racketeering case that included "names, places, and conduct that tracks the indictment").

Here, the music videos and lyrics the government seeks to admit at trial are relevant and admissible for multiple reasons.  First, the statements about 18th Street as an organization, 18th Street's geographical territory along Roosevelt Avenue, those involved in 18th Street, and the symbols used by 18th Street members are plainly admissible to show the existence of the Enterprise, its members and associates and their associations with one another.  See generally Indictment ¶¶ 1-7 (describing the Enterprise).  These lyrics reference the specific territory controlled by 18th Street and details about how members identify themselves that tie to the racketeering allegations in the case.  In addition to the lyrics, the videos depict numerous 18th Street members, see generally Ex. B-1; B-2; B-3, some flashing signs representing 18th Street, and some with tattoos or wearing clothing with colors, numbers and/or symbols associated with 18th Street, such as "18," "X", and "V3," consistent with the Indictment.  See Indictment ¶ 1.

The proffered statements and videos also delineate the geographic area that the 54 Tiny Locos clique considers to be its territory in Queens, and reference 18th Street's broader operations in California and Mexico.  In addition to the statements referencing Roosevelt Avenue and 82nd Street, the videos include photographs and videos of the area, including the subway stop for the 7 train at Roosevelt Avenue and 82nd Street, street signs and blocks around the area, and references to Queens.  See Indictment ¶ 1.  Similar to the rap lyrics admitted in Miller and Forney,

29

these lyrics are relevant and admissible because they reference specific names and places relevant to the racketeering charges—i.e., the name of the gang and its members, including the gang's leader, and locations within 18th Street's territory on Roosevelt Avenue in Queens.

Second, as discussed above, the government expects to introduce evidence about 18th Street rivalries and shootings and assaults of rival gang members, which is consistent with the proffered statements and the methods and means of the Enterprise as alleged in the Indictment. See Indictment ¶¶ 7(b) ("Members of 18th Street and their associates used and threatened to use physical violence against various individuals, including members of rival criminal organizations and 18th Street members and associates believed to have violated the Enterprise's rules."). The proffered statements specifically reference 18th Street's rivalry with MS-13 and describe 18th Street's use of violence against rival members and against anyone who starts trouble with 18th Street members, which is central to the charged crimes. For example, one of the proffered statements is "[w]e're not leaving, you already know we rep and die for 82. We multiply. I've seen big dogs rise up and fall down. Killing MS has become my job. I don't like to talk too much. Wherever I go, this is how it is for all my homeboys." Ex. A-2 at 5. Another statement refers to "MS" as the enemy and 18th Street's use of guns if "test[ed]" by enemies or as retaliation: "Don't worry because retaliation is in my game. With a .38, I roll solid, reppin' X8, so the whole world knows 18 is here. My gun and my balls are ready for my enemy if he wants to test me. Pack of MS assholes." Ex. A-3 at 3; see also Ex. A-2 at 5 (There's no truce here, and definitely no equals. If you cross paths with this pirate, you're done for."); 7 ("I have my scapulary and insane backup for any rival punk who thinks he's too tough"). Other statements warn that violence will be used if rivals enter 18th Street territory. Ex. A-2 at 4 ("Only flow I have for you, I roll up in your hood with a straight out fuck you. I don't wanna front like I'm cool, 'cause I'm not. But if I see you on

30

the turf, you know I'm gonna shoot."); 4 ("Outlaw, with skill and all the violence.  My mind only thinks about kicking your jaw, you ain't worth shit, so you better think twice before acting tough and stepping into this jungle").

The proffered statements are consistent with the means and methods of 18th Street alleged in the Indictment and the specific charged acts of violence, including the motive for such acts.  Specifically, as testimony at trial will establish, 18th Street members were expected to kill rival gang members, and MS-13 was one of 18th Street's main rivals.  The government also anticipates that testimony at trial will establish that 18th Street members were expected to assist other members in violent acts against 18th Street rivals.  With respect to the Vásquez Murder, the government expects that testimony and evidence will establish that Rodríguez understood Vásquez to be an MS-13 member, and that the defendants murdered Vásquez because of his membership in a rival gang.  This motive is consistent with the proffered statements in the music videos, including statements that 18th Street rivals, including MS-13, would be killed.  See, e.g., 4 ("But if I see you on the turf, you know I'm gonna shoot"); 5 ("Killing MS has become my job"); Ex. A-3 at 3 ("Don't worry because retaliation is in my game. With a .38, I roll solid, reppin' X8, so the whole world knows 18 is here.  My gun and my balls are ready for my enemy if he wants to test me. Pack of MS assholes").  Martínez Villanueva's involvement in the shooting is also consistent with the proffered statements in the music videos, including the expectation that 18th Street members assist and back up other 18th Street members in fights with rivals or enemies more generally.  See, e.g., Ex. A-1 at 3 ("if you shoot, I'm quick with the assist"); A-3 at 2 ("Big ups to all my TLS homies; straight up 18. We've got respect. And we've got control, too. If you clash with these dudes, your life is over"); 2 ("Soldiers without fear, watching the sidewalk").  Like the rap lyrics in Forney that were admissible because they referenced expectations and rules between

31

prostitutes and pimps, lyrics in the music videos referencing the expectations of 18th Street members—i.e., the rules of the gang, including shooting rivals, assisting other members in fights and patrolling the territory—vis-à-vis each other and with their specific rivals are equally specific and relevant to the charges in this case.

As to Rodríguez's attempted murder of John Doe-1, the government expects that testimony and evidence will establish that when hanging out in a group, 18th Street members often carried a firearm with them for use in potential altercations.  The government expects to establish through ballistic evidence that, on the night Rodríguez attempted to murder John Doe-1, Rodríguez shot at John Doe-1 with a firearm used by 18th Street members.  The government also expects to establish that Rodríguez fired at John Doe-1 after the latter got into a fight with another 18th Street member.  As noted above, this, too, is consistent with the proffered statements in the music videos that 18th Street members were expected to assist and participate in violence against enemies of 18th Street and that 18th Street members were ready to die if needed.

Third, consistent with the alleged purposes of the Enterprise in the Indictment as "[p]romoting and enhancing the prestige, reputation and position of the Enterprise with respect to rival criminal organizations," and "[k]eeping victims and rivals in fear of the Enterprise and its members and associates," see Indictment ¶¶ 6(b)-(c), 18th Street Gang members released these music videos to send messages and statements to the community.  For example, in the proffered statements, 18th Street warned rivals that its members were armed and ready to shoot as a way of enhancing their reputation and scaring rivals.  The statements within the music videos also addressed the expectations and rules placed on 18th Street members.  For example, the proffered statements include descriptions of how members are supposed to stay alert, watch the territory, and be ready to fight and die to protect 18th Street.  These messages not only assisted the Enterprise

32

in meeting its purpose of keeping rivals in fear by describing what would happen to enemies, but also the purpose of "ensuring discipline within the Enterprise and compliance with the Enterprise's rules" by reminding members what was expected of them. See Indictment ¶ 6(e).

Fourth, the statements regarding 18th Street's criminal activity are probative of the charged crimes and the pattern of racketeering activity alleged in the Indictment, including 18th Street's access to guns and drug trafficking. See Indictment ¶¶ 2, 7. For example, the government will demonstrate at trial that the defendant and other members and associates of 18th Street distributed narcotics as a means of making money. As stated above, the government will also demonstrate that the defendant and other members of 18th Street had access to and frequently possessed firearms to carry out violence against rival gang members. The proffered statements include specific references to selling drugs and having access to and carrying weapons for potential altercations, which is consistent with the enumeration of 18th Street's criminal activities and use of violence.

In sum, the three music videos specifically reference people, places, rules and expectations, rivals, criminal activity, and general identifiers for 18th Street that are relevant to the issues presented in this case. The government must not only prove the existence of the Enterprise, the defendant's membership in the Enterprise, and the commission of the underlying crimes, but it must also prove that the crimes were committed in connection with 18th Street. Thus, these music lyrics are relevant and admissible. For example, Count One requires the government to prove that Rodríguez's narcotics trafficking conspiracy, the John Doe-1 Attempted Murder and the Vásquez Murder were part of the conduct of the affairs of 18th Street through a pattern of racketeering activity. See Indictment ¶ 10. Counts Three and Four require the government to

33

prove that Rodríguez and Martínez Villanueva murdered Vásquez "for the purpose of gaining entrance into, and maintaining and increasing position in, 18th Street." See Indictment ¶¶ 18, 20.

Although the videos and lyrics contain some minor profanity and gunshot sounds, the visuals are predominantly pictures of 18th Street members and associates and the probative value of this evidence—specific statements and imagery tied to the Enterprise and the allegations in the Indictment—far outweighs any potential prejudice given that defendants are charged variously with racketeering and murder. See United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1757777, at *8 (E.D.N.Y. Apr. 17, 2015) (probative value of video excerpts depicting guns and drugs in a case charging narcotics trafficking and weapons charges outweighed the risk of unfair prejudice under Rule 403); Herron, 2014 WL 1871909, at *4 ("In this circuit, evidence is not unduly prejudicial when it is not 'more inflammatory than the charged crime[s]'") (citation omitted).

IV.    Evidence of Rodríguez's Statements to and Use of Violence Against CW-1 is Admissible

At trial, the government intends to introduce evidence of Rodríguez's physical abuse and sexual abuse against CW-1. Specifically, the government intends to introduce evidence that on various occasions Rodríguez punished CW-1 by beating her, including for 18 seconds, and that Rodríguez raped CW-1. The government seeks to introduce this evidence so that the jury can understand the relationship and dynamic between Rodríguez and CW-1 and the motive for their participation in Vásquez's murder. Because the high probative value of this evidence is not substantially outweighed by a risk of unfair prejudice, the Court, in its wide discretion, should admit this evidence.

A.    Applicable Law

Courts in this Circuit follow an "inclusionary rule allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the

34

evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." Carboni, 204 F.3d at 44 (citation omitted). The Second Circuit grants "wide discretion" to district courts "in making this determination." Id.

Evidence that "adds context and dimension to the government's proof of the charges" are routinely admitted by courts in order to demonstrate "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." Gonzalez, 110 F.3d at 941 (quoting Coonan, 938 F.2d at 1561). "Relevant evidence is not confined to that which directly establishes an element of the crime." Id. The prosecution, as the party with the burden of proof, has a "need for evidentiary richness and narrative integrity in presenting case." Old Chief v. United States, 519 U.S. 172, 183 (1997) ("People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard.").

Courts have admitted evidence of a defendant's violence towards his partner or other individuals when the evidence at issue provides background or context for the jury. For instance, in United States v. Holt, the Seventh Circuit affirmed the admission of a defendant's abusive sexual relationship at a witness intimidation trial because it "explained the hold [the defendant] had over a woman twenty years or so his junior" and provided background for the jury. 460 F.3d 934, 938 (7th Cir. 2006). And, in United States v. Gartmon, the D.C. Circuit found no abuse of discretion in the admission of evidence that the defendant placed a gun in a witness's vagina and told her to do as he said, since "it went a long way toward explaining why a woman who did not benefit monetarily would have entered into and continued in the [fraud and money laundering] scheme charged in the indictment." 146 F.3d 1015, 1019-20 (D.C. Cir. 1998).

35

B.    Discussion

Here, the government intends to introduce evidence, through CW-1, of her relationship with Rodríguez, and limited evidence of Rodríguez's physical abuse and sexual abuse towards CW-1.  For example, the government intends to introduce evidence of instances in which Rodríguez beat or otherwise physically abused CW-1 due to his temper or when CW-1 displeased him, including after CW-1 drank alcohol or spent money; when she purchased items with rival gang colors or spoke to other 18th Street members; or after Rodríguez was displeased after speaking to his own family members.  The government also anticipates that CW-1 will testify that, on at least one occasion, Rodríguez put a gun in CW-1's mouth and threatened her.  Furthermore, the government also intends to introduce evidence that Rodrigeuz raped CW-1 multiple times because he wanted her to carry his child.

This evidence is admissible to explain the relationship between Rodríguez and CW-1 and sheds light on Rodríguez's decision to conspire with CW-1 in the charged murder.  CW-1's testimony is "central to the government's case at trial," United States v. Santos, 541 F.3d 63, 65 (2d Cir. 2008), and the government expects that CW-1's credibility will be a critical issue at trial. The evidence of CW-1's participation in other crimes with the defendant, as well as the nature and scope of the defendant's relationship with her, therefore provides an essential part of the story of how CW-1 came to conspire with the defendant in the charged conduct and his reasons for trusting that she would assist him and not report him to law enforcement.  See Pitre, 960 F.2d at 1119 ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

Any potential prejudice that results from admitting this evidence does not substantially outweigh the probative value. See Fed. R. Evid. 403, Advisory Committee Notes ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."); see also Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 618 (5th Cir. 1977) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'"). The instances of violence by Rodríguez toward CW-1 are not more prejudicial than the actual murder in-aid-of racketeering and attempted murder in-aid-of racketeering, among other criminal charges, that Rodríguez faces at trial. See, e.g., United States v. Delligatti, No. 15-CR-491 (KBF), 2018 WL 1033242, at *7 (S.D.N.Y. Feb. 23, 2018) (finding the defendant's participation in a prostitution business with a cooperating witness to be "probative of the nature of the conspiracy and relationships within the conspiracy" and no more prejudicial than the murder with which the defendant was charged); United States v. Holt, 460 F.3d 934, 938 (7th Cir. 2006) (finding no abuse of discretion in district court's finding that probative value of evidence of defendant's abusive sexual relationship with minor child at witness intimidation trial outweighed prejudicial impact); United States v. Ulbricht, 79 F. Supp. 3d 466, 487 (S.D.N.Y. Jan. 7, 2015) (admitting evidence of a murder for hire scheme in a narcotics conspiracy case and finding that despite "introducing an element of violence" into the case, its probative value outweighed the danger of unfair prejudice). Given the violent nature of the crimes charged in this case, evidence of Rodríguez's violence towards CW-1 does not result in any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the evidence. Therefore, the Court should admit evidence of Rodríguez's violence towards CW-1.

37

V.    Autopsy Photographs and Body-Worn Camera Footage are Admissible

The government intends to introduce a limited number of autopsy photographs depicting the murder victim's wounds, as well as limited body-worn camera footage depicting the crime scene after the shooting.

The Second Circuit has made clear that the graphic nature of autopsy photographs does not alone render them inadmissible. See United States v. Salim, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (collecting cases). The analysis of admissibility "hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination." Id. Courts have routinely admitted autopsy photographs where, as here, the jury must make factual determinations about a death. See United States v. Osborne, 739 F. App'x 11, 18 (2d Cir. 2018) (affirming admission of autopsy photographs and concluding that they were "plainly relevant" where the government had to prove the murder and noting that the "fact that the photos might have been graphic [did] not render them unfairly prejudicial"); United States v. Frappier, 807 F.2d 257, 262 (1st Cir. 1986) (noting that autopsy photographs "were not egregiously shocking; most if not all of them bore reference to medical testimony and corroborated [witness's] account of the murder."). Here, the autopsy photographs are admissible as they will demonstrate and corroborate witness testimony, specifically the medical examiner's testimony about how the victim died.[14]

The body-worn camera footage depicting the scene after the shooting is also admissible. The government intends to introduce limited body-worn camera footage of several NYPD officers who responded to the scene of the shooting. Among other things, the footage

---

[14]    The government will limit the number of autopsy photographs it intends to offer in order to minimize any potential prejudice and ensure that the images are not cumulative of one another or other evidence.

depicts the victim after he was shot and the vehicle that the victim was traveling in when shot, including damage to the vehicle. NYPD officers at the scene are heard discussing shell casings recovered at the scene, damage to the vehicle, and the use of a motorcycle or scooter used by the perpetrator. These statements corroborate witness testimony and other evidence the government intends to introduce at trial regarding the circumstances surrounding the victim's death.

The body-worn camera footage is admissible as a business record under Rule 803(6) of the Federal Rules of Evidence because (1) the recordings were made contemporaneously when the events recorded took place; (2) the recordings were kept in the regular course of the NYPD's business; (3) making such recordings is the regular practice of the NYPD; (4) the NYPD officers (or an NYPD custodian of body-worn camera) can testify as to the conditions under which the recordings took place; and (5) there is no indication of a lack of trustworthiness. See Fed. R. Evid. 803(6); United States v. Yuan Li, No. 18-CR-302 (BMC), 2020 WL 6393038, at *12 (E.D.N.Y. Nov. 2, 2020) (noting that "911 emergency phone call[s] . . . . are regularly admitted into evidence as business records" and applying the rubric for 911 calls to contemporaneous law enforcement recordings).

The statements made on the body-worn camera footage are also admissible as present sense impressions and excited utterances under Rules 803(1) and (2) of the Federal Rules of Evidence, respectively. Rule 803(1) "has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994). An excited utterance under Rule 803(2), which is a statement relating to a startling event while the declarant is under the stress of excitement caused by the event, "need not be contemporaneous with the

39

startling event to be admissible." United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002).  Here, the relevant statements made by officers occurred minutes after the shooting as the victim was awaiting medical assistance.  Further, given that the perpetrators were still at-large, the statements were intended to assist NYPD officers as they responded to an active crisis.  There are no indicia that the statements were deceptive or made for any purpose other than to respond to an ongoing emergency.

VI.    Use of Summary Evidence and Illustrative Aids

A.    Applicable Law

Following the December 2024 amendments, the Federal Rules of Evidence draw a distinction between two types of party-created exhibits.  "Summaries," which are governed by Rule 1006, are used to prove the contents of voluminous evidence in a more convenient and digestible format than the underlying records themselves.  Summaries are admissible as evidence and may be treated by the jury like any other evidence.  See Fed. R. Evid. 1006(a).  "Illustrative Aids," by contrast, which are governed by the new Rule 107, are used as a pedagogical tool to explain a party's arguments about admitted evidence.  Illustrative Aids may be shown throughout the trial, but are not admissible in evidence.  See Fed. R. Evid. 107(b).[15]

---

[15]    There is also a third category of exhibits, known as "hybrid" exhibits, which are admissible as substantive evidence "when the underlying materials have been admitted and the [exhibit] 'so accurately and reliably summarize[s] complex or difficult evidence' that the court admits it to assist the jurors."  6 Weinstein's Federal Evidence § 1006.04[2] (quoting United States v. Kerley, 784 F.3d 327, 341 (6th Cir. 2015)).  These charts "may include assumptions and conclusions" where "said assumptions and conclusions [are] based upon evidence in the record."  United States v. Wainright, 351 F.3d 816, 821 (8th Cir. 2003).  And while the proponent of a hybrid exhibit must provide "enough explanation to allow the jury to see how the [data] on a chart were derived from the underlying evidence," the proponent need not "provide detailed testimony stating the basis of each" particular entry on the chart.  United States v. Citron, 783 F.2d 307, 317 (2d Cir. 1986).  One prototypical example of such hybrid exhibits that may be admitted into evidence and sent into jury deliberations are documents used by experts to convey their expert opinions, such as maps created by a cell-site expert.  See United States v. Powell, No. 21-CR-572

40

B.    Video Compilations Are Admissible As Summary Evidence

Pursuant to Fed. R. Evid. 1006(a), "The court may admit as evidence a summary . . . offered to prove the content of voluminous . . . recordings . . . that cannot be conveniently examined in court, whether or not they have been introduced into evidence."

Under that rule, an exhibit that summarizes voluminous audio or video recordings by combining the pertinent portions of the recordings into one digestible recording or video is admissible as substantive evidence, as courts have long held. See 6 Weinstein's Federal Evidence § 1006.03 ("[A]n edited audio or video tape is admissible to summarize a lengthy tape recording."). The earliest cases involved audio recordings.  For example, in United States v. Segines, the government sought to admit a "composite tape" designed to cull "hours" of recordings into "more concise tapes with the pertinent relevant conversations on it."  17 F.3d 847, 854 (6th Cir. 1994). The Sixth Circuit held that the composite tapes were properly admitted under Rule 1006 because they "save[d] the trial court much time and inconvenience and [because] the prosecution [had] laid the proper foundation on the accuracy and authenticity of the composite tape for its admission into evidence."  Id.  Similarly, in United States v. Bakker, the Fourth Circuit upheld the admission under Rule 1006 of "eleven composite tapes" that had been "edited" to distill "over two hundred hours" of recordings to the relevant portions.  925 F.2d 728, 736-37 (4th Cir. 1991).  The Fourth Circuit rejected an argument that the composite tapes were unrepresentative of the underlying recordings, holding that such as argument "goes to the weight to be accorded to the composite tapes, not to their admissibility."  Id. at 37.  See also, e.g., United States v. Rengifo, 789 F.2d 975, 979 n.3 (1st Cir. 1986) ("This court has long upheld the use of composite tapes as evidence.");

---

(EK), Jan. 23, 2025 Tr. 1361-64 (admitting cell-site expert's materials as substantive evidence over defense objection).

United States v. Gorel, 622 F.2d 100, 106 (5th Cir. 1979) ("The Federal Rules of Evidence permit admission of summaries of recordings when the original or copies of the originals are made available to the other party.").

As video surveillance has become more prevalent, more recent cases have addressed video compilations. Several courts handling prosecutions relating to incidents that occurred at the United States Capitol on January 6, 2021 have admitted compilations of videos of those events as summaries pursuant to Rule 1006. See, e.g., United States v. Fuller, No. 23-CR-209 (CKK), 2024 WL 4880497, at *4-5 (D.D.C. Nov. 25, 2024) ("[T]he montages serve as appropriate items of summary evidence that effectively avoid delay at trial."); United States v. Crawford, No. 23-CR-426 (JEB), 2024 WL 1908799, at *3 (D.D.C. May 1, 2024) (admitting video compilation under Rule 1006).

In addition, several state courts have admitted video compilations under their analogues of Rule 1006. See, e.g., Harrod v. State, 314 A.3d 415, 436 (Md. App. Ct. 2024) ("If the source materials are videotapes, logically, summary evidence can take the same form. Indeed, composite audio and video recordings have long been considered summary evidence by courts in other jurisdictions."); Commonwealth v. Sosa, 222 N.E.3d 5, 19 (Mass. 2023) (encouraging use of compilations "particularly where a jury may find it difficult to master the technology necessary to find and view the relevant parts of the complete videos in the jury room").

The presence of annotations does not render a summary exhibit inadmissible. See United States v. Lewis, No. 22-10783, 2023 WL 6173459, at *3 (11th Cir. Sept. 22, 2023) ("[W]e reject Mr. Lewis' contention that Rule 1006 requires that the summary evidence be 'unaltered' and thus free from any highlighting or notations 'not in the original records.'"); see also People v. Fernandez, 210 A.D.3d 693, 696 (N.Y. App. Div. 2022) (finding that the trial court did not abuse

42

its discretion in admitting a video compilation because "[t]he creator of the compilation video explained the compilation process and explained that the additions to the video, such as the insertion of time and date captions, circles, and arrows, merely highlighted portions of the video rather than changed the substance of the video . . . [and] the compilation video was admitted into evidence only after the original surveillance videos were admitted.") (internal citations omitted).

Thus, the common use of annotations in compilations—including zooms, arrows, circles, insets of publicly-available maps, and other forms of highlighting, as well as a "real-time" clock to correct errors in underlying videos' time stamps—does not change the analysis. And while the act of making such a compilation necessarily involves some decision-making about what footage to include or exclude, that is not a barrier to its admissibility. See Crawford, 2024 WL 1908799, at *3 ("The fact that the Government made decisions about which footage to include and exclude in the montages and how best to compile that footage, among other things, is therefore neither surprising nor troubling under . . . Rule [1006]; if anything, it is inevitable."). Nor does the fact that a compilation reflects the government's version of events undermine its status as a summary. See United States v. Menendez, 759 F. Supp. 3d 460, 521 (S.D.N.Y. 2024) ("[A] summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case"; "It was well within the government's right to select and present evidence that would support its narrative.").

Here, the government intends to admit multiple video compilations summarizing hours of video surveillance into digestible exhibits. All of the underlying surveillance video will be separately admitted into evidence and will be available to the jury in its original form. The government anticipates that the compilations will contain annotations such as those described above to assist the jury in following the events captured on video. Accordingly, the government

43

respectfully submits that the Court should admit as evidence video compilations that comply with the above requirements and descriptions.[16]

### C.        Use of Illustrative Aids During Trial

Prior to Rule 107, some courts limited the use of Illustrative Aids to opening or closing arguments and precluded their use during trial on the basis that they were "argumentative." Cf. UPS Store, Inc. v. Hagan, No. 14-CV-1210 (WHP), 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) ("[G]reat care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative."). Rule 107, however, allows the use of Illustrative Aids "at any point in the trial," not just opening statements and closing arguments. See Fed. R. Evid. 107 advisory committee note. This is in keeping with the growing recognition in the case law prior to the enactment of Rule 107 that a trial "is essentially a teaching learning process" and "[i]ncreased flexibility in the use of [Illustrative Aids] will probably result in courtroom findings more consonant with truth and law." Verizon Directories Corp. v. Yellow Book USA, Inc., 331 F. Supp. 2d 136, 141-44 (E.D.N.Y. 2004) (Weinstein, J.).

The fact that an Illustrative Aid may illustrate only one side's arguments is not a basis for preclusion. See 1 Weinstein's Federal Evidence § 107.03 ("Illustrative aids are used to reflect the party's own case. A party is not required to include in its charts or summaries its opponent's version of the facts."). Rather, under Rule 107, Illustrative Aids should be permitted as long as their "utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time." Fed. R. Evid. 107(a); see also Fed. R. Evid. 107 advisory committee note (Illustrative Aids may not "distort or oversimplify the evidence presented, or stoke unfair prejudice").

---

[16]    The government has provided the defendants with drafts of the compilation videos and will provide finalized versions as soon as they are ready.

44

The government respectfully requests that the Court permit the use throughout the trial of Illustrative Aids as long as they comply with the requirements of Rule 107. The government intends to disclose to the defendants a number of Illustrative Aids in advance of trial to allow the defendants the opportunity to object.

VII.    Authentication of Video Recordings

The government will confer with the defendants regarding possible stipulations to authenticate surveillance and other video. In the event the defendants do not stipulate, the government raises this issue now to provide the Court with the relevant law and to avoid the need for unnecessary sidebars or arguments during trial.

Under Rule 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "The bar for authentication of evidence under Fed. R. Evid. 901(a) is not particularly high." United States v. Bout, 651 F. App'x 62, 63 (2d Cir. 2016). Examples of evidence that satisfy this requirement include (1) "[t]estimony that an item is what it is claimed to be;" and (2) absent testimony, the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." See Fed. R. Evid. 901(b)(1), (4).

"Videos may be authenticated on the same principles as still photographs, and still photographs may be authenticated by a witness familiar with what is pictured." Linde v. Arab Bank, PLC, 97 F. Supp. 3d 287, 338 (E.D.N.Y. 2015), vacated on other grounds, 882 F.3d 314 (2d Cir. 2018). "Evidence of how the video tapes were made and handled before they came into the proponent's possession is not necessarily required to authenticate them." Id. Thus, video can be authenticated by, for example, an individual with personal knowledge of the events shown on the tape. At the same time, in appropriate circumstances a witness need not have personal knowledge

45

of the particular events shown on the video tapes.  See United States v. Rembert, 863 F.2d 1023, 1028 (D.C. Cir. 1988) (affirming admission of surveillance video where witness had no personal knowledge of events depicted; photographs "can be admitted as evidence independent of the testimony of any witness as to the events depicted").  For example, video of a location can be authenticated by testimony that a witness recognizes the location depicted in the video as that particular location.  See United States v. Broomfield, 591 F. App'x 847, 851 (11th Cir. 2014) (location of video established by testimony that a witness recognized location).  Similarly, video of a location can also be authenticated by testimony that the witness collected the video from a video system at that location.  See United States v. Ida, No. 96-CR-430 (LAK), 1997 WL 122753, at *2 (S.D.N.Y. Mar. 18, 1997) (video authenticated by testimony that the video was a copy of video from a particular location).  Speculation that a video might have been tampered with at some point, without more, is not a basis to exclude the video.  See id. at *3 (rejecting "theoretical possibility" that video had been altered; "defendants' contentions concerning chain of custody, the quality of Agent Kelleher's testimony, and so on go to the weight, rather than admissibility, of this evidence").

In addition to establishing that surveillance video depicts a certain place, the proponent must show the approximate time of the scene depicted in order to establish relevance, although separate witnesses can establish the location and the time.  See Broomfield, 591 F. App'x at 851 (evidence admitted after separate witnesses established time and place).  Imprecision as to the time of the video goes to weight, not admissibility.  See United States v. Whittingham, 346 F. App'x 683, 685 (2d Cir. 2009) ("Although there was testimony that the time-stamp [of] the video was off by as much as five minutes, this slight discrepancy does not prove fatal; indeed, this testimony may make the evidence less credible to the jury, but it does not make it inadmissible.").

46

A witness can make the required showing as to timing through, for example, testimony that he or she compared the timestamp on the video system to an accurate clock and determined whether the timestamp was accurate and, if not, approximately how fast or slow it was. See United States v. Brack, No. 18-CR-684 (ENV) (oral decision dated Mar. 5, 2020) (overruling objection to video evidence where witness compared video system timestamp to his iPhone to determine accuracy).

Similarly and alternatively, in instances where precision of time or place is relevant but cannot be established by a witness with knowledge, a party can authenticate exhibits by reference to other, already-authenticated exhibits depicting the same time and place. This method of "[a]uthentication by comparison is routine." Valve Corp. v. Ironburg Inventions Ltd., 8 F.4th 1364, 1371 (Fed. Cir. 2021); see also United States v. Fridman, 974 F.3d 163, 179-80 (2d Cir. 2020) ("comparison can sufficiently authenticate documents"); United States v. Hoyt, 946 F.2d 127, at *1 (D.C. Cir. 1991) (Fed. R. Evid. 901(b)(3) permits authentication by comparison); United States v. Stearns, 550 F.2d 1167, 1171-72 (9th Cir. 1977) (finding that first picture "authenticates the other four pictures as to time"); United States v. Safavian, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) (allowing authentication of emails by comparison with other "emails that already have been independently authenticated"); United States v. Prevezon Holdings, Ltd., 319 F.R.D. 459, 464 (S.D.N.Y. 2017) (evidence "may be authenticated through a comparison" with an authenticated item). In particular, the government anticipates admitting certain video through a witness who will testify that he has watched the video and compared it to other video in evidence and that he can determine the time and location of the unadmitted video based on a comparison to the admitted video—for example, because the two videos depict the same event or because recognizable individuals or vehicles can be seen moving between the videos.

47

The government therefore respectfully submits that it should be permitted to admit surveillance video exhibits into evidence if it satisfies the requirements outlined above.

## VIII. The Court Should Preclude Any Evidence Introduced by the Defendants Seeking to Elicit Sympathy

The defendants should be precluded from commenting on, introducing or eliciting any evidence that seeks to elicit sympathy from the jury including, but not limited to, evidence concerning the defendants' personal, health, or family circumstances, or evidence of the defendants' good character through specific instances of conduct. At this time, it is unclear which of this evidence, if any, the defendants may seek to introduce. However, in an abundance of caution, the government moves to preclude such evidence including, for example, the defendants' personal hardships or family issues, as not relevant to the issues in this case because they have no bearing on whether the defendants committed the charged crimes. See Fed. R. Evid. 401(a) (evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence").

Even if such evidence had some probative value, it must be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Exclusion is appropriate where the admission of evidence creates "risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme." Fed. R. Evid. 403, Adv. Comm. Notes; see also United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009) (evidence should be excluded if it has "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses"); United States v. Battaglia, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether

48

[d]efendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man"); United States v. Malpeso, 115 F.3d 155, 162-63 (2d Cir. 1997) (excluding evidence and precluding argument on issues that had "little or no relevance" to the charged crimes and might encourage jury nullification).  Here, any attempt by the defendants to make an emotional appeal to the jury's sympathy should be excluded.

IX.    The Court Should Preclude Any Evidence Relating to Possible Punishment and Collateral Consequences

The Court should preclude the defendants from mentioning any consequences of their convictions at trial.  While the defendants have not suggested that they intend to introduce any discussion of these consequences at trial, out of an abundance of caution, the government moves to preclude any discussion of such evidence at trial.  Because the defendants' punishment is not a fact "of consequence" to be determined at trial, see Fed. R. Evid. 401(b), any evidence of such issues is not relevant and must be excluded.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").  Such evidence is not only irrelevant, but it "invites [jurors] to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand, et al., Modern Federal Jury Instructions ("Sand"), Instruction 9-1 (2017 ed.); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict, due to the likelihood that prejudice, unfairness, and confusion [] would result.").  Therefore, the Court should preclude the defendants from referencing potential punishment or collateral consequences at trial.

49

X.     The Court Should Permit the Government to Recall Certain Witnesses

The government respectfully seeks permission to recall certain law enforcement witnesses over the course of the trial to allow for evidence to be presented in the most comprehensible and time-effective manner possible.  The Court has authority to permit such procedures under its broad discretion to "control . . . the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth" and "avoid wasting time." Fed. R. Evid. 611(a); see also United States v. Guerrero, 882 F. Supp. 2d 463, 483 (S.D.N.Y. 2011) ("A trial court has broad discretion in deciding whether to permit a party to recall a witness.").

Given that the government will be offering proof of at least two charged shootings, to help the jury understand and keep straight each event, the government intends to present evidence grouped by event, to the extent possible.  Thus, rather than introducing all video compilations, or all cell-site evidence, or all cell phone evidence in long, dull chunks at the end of the trial, the government may seek to present evidence relating to a particular event close in time to other evidence relating to that event so that the jury can understand how the evidence for any given event fits together.

The government could accomplish this by, for example, calling multiple separate publication witnesses at various points.  This has the disadvantage of wasting time by requiring each of the multiple witnesses to be introduced during direct examination and to be subject to the same foundational cross-examinations.  By contrast, several courts overseeing complex trials have allowed the government to recall a single witness multiple times to provide relevant testimony at logical points in the trial—for example, recalling the same video compilation witness to introduce a compilation relating to a particular murder when that murder is under discussion, rather than calling multiple different compilation witnesses.  See, e.g., United States v. Elmer Stewart Rhodes

50

III, et al., No. 22-CR-15 (APM) (D.D.C.) (allowing government to recall publication witnesses in "Oath Keepers I" January 6 trial); United States v. Ethan Nordean, et al., No. 21-CR-175 (TJK) (D.D.C.) (same in "Proud Boys leadership" trial); see also United States v. Clanton, No. 23-CR-328 (KAM) (E.D.N.Y.) (permitting government to call publication witness two separate times during trial).   The defendants would then have the opportunity to engage in focused cross-examination relating to a particular event each time a witness testifies, rather than needing to cover the full scope of the trial in a single marathon cross-examination.

The government submits that allowing this procedure will improve comprehensibility of the evidence, minimize confusion and repetition, and improve efficiency and allow for a shorter trial, and would not prejudice the defendants, as they would have a full opportunity to cross-examine the witnesses as to their testimony immediately after each direct. The government therefore respectfully requests that it be permitted to recall certain witnesses during the trial as appropriate to best serve the interests of allowing the jury to "determine[e] the truth" and "avoid[ing] wasting time."  Fed. R. Evid. 611(a).

XI.     The Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits to Be Introduced During Their Case-in-Chief

The government respectfully requests that the Court order the defendants to disclose defense exhibits, including exhibits they intend to introduce through cross-examination of government witnesses, no later than 10 days before jury selection—i.e., on or before February 13, 2026.

Federal Rule of Criminal Procedure 16(b) governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A).  The Rule's purpose "is to avoid surprise and gamesmanship," and "it

51

definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial." United States v. Hsia, No. 98-CR-0057 (PLF), 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000).

Of course, Rule 16 does not require a defendant to disclose documents he intends to use for purposes of impeaching a government witness (just as Rule 16 does not require the government to disclose documents it intends to use to impeach defense witnesses).  But to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief, in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16 and must be produced.  In Hsia, the court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, [which] is not part of [the defendant's] case-in-chief." 2000 WL 195067, at *2 n.1.  Courts in this district have repeatedly recognized this distinction, ordering the production of defense exhibits "that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination. See, e.g., United States v. Powell, No. 21-CR-572 (EK), 2025 WL 90128, at *7 (E.D.N.Y. Jan. 13 2025) (ordering the defense to "promptly disclose any substantive, non-impeachment exhibits to the government, regardless of whether it intends to introduce them before or after the government rests."); United States v. Cory Martin, No. 20-CR-549 (AMD), ECF Order (E.D.N.Y. Feb. 1, 2024) (ordering disclosure of defense exhibits in murder-for-hire trial seven days prior to jury selection and witness statements, not including the defendant, two days before the witness's testimony); United States v. Smothers, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); United States v.

52

Warren, No. 22-CR-231 (DLI), ECF Order (E.D.N.Y. Sept. 6, 2023) (ordering disclosure of defense exhibits in felon-in-possession trial six days prior to jury selection); United States v. Thorpe, No. 19-CR-492 (HG), Pretrial Conference Tr. 41 (E.D.N.Y. Aug. 23, 2023) (granting government's motion for disclosure of Rule 16 discovery and defense exhibits two weeks before trial, explaining, "It's not only exhibits that you would introduce if you called a witness, but it's exhibits that you know you're going to introduce through, let's say, the case agent.  It's not only what you're going to put on once the Government says, 'the Government rests.'"); United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant.").  That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit.  See Smothers, 2023 WL 348870, at *22 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody").

Here, the government has requested the defendants' Rule 16 materials in discovery letters; to date, the defendants have not disclosed anything. The defendants' failure to provide reciprocal discovery may be a result of having none to produce; they may not intend to introduce any evidence at trial, as is their right. The defendants, however, cannot rely upon an undefined defense strategy to avoid producing documents in compliance with the spirit and letter of Rule 16 and the Court's Individual Rules.  Accordingly, to avoid unfair surprise and undue delay during the trial, the government respectfully requests that the Court order the defendants to identify any defense exhibits they intend to introduce during the government's case (but not those documents

53

to be used for impeachment purposes only) or any defense case no later than February 13, 2026, ten days before jury selection.

The government further respectfully submits that, to avoid delay during the trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendants.  See Fed. R. Crim. P. 26.2.  The government proposes that the Court order that government and defense Rule 26.2 materials be exchanged simultaneously on a date agreed-upon by the parties or, if necessary, set by the Court.  See United States v. Boustani, No. 18-CR-681 (WFK), ECF No. 120 at 1-2 (E.D.N.Y. July 31, 2019) (ordering simultaneous exchange of Rule 26.2 material).

Finally, to avoid any unnecessary objections or delays during opening statements, the government respectfully requests that the Court order that the parties mutually exchange any demonstratives each party intends to use during opening statements no later than February 19, 2026.  See United States v. Aguilar, No. 20-CR-390 (ENV), ECF No. 238 at 1-2 (E.D.N.Y. Jan. 2, 2024) (ordering exchange of opening-statement demonstratives after completion of jury selection).  The government respectfully submits that such demonstratives should not include any

54

exhibits, as exhibits generally may not be shown to the jury during opening statements. See id. at

1; Williams v. Vahey, No. 20-CV-2560 (KAM), 2023 WL 130834, at *1 (E.D.N.Y. Jan. 8, 2023).

CONCLUSION

For the foregoing reasons, the Court should grant the government's motions in

limine in their entirety.

Dated:     Brooklyn, New York
           November 17, 2025

                                        Respectfully submitted,

                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Andrés Palacio
Megan Larkin
Brachah Goykadosh
Assistant United States Attorneys
       (Of Counsel)