UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,    :
               :
    v.        :  **MEMORANDUM AND ORDER**
               :  20-CR-548 (WFK)
HERBERTH RODRIGUEZ and   :
ELIAS MARTINEZ VILLANUEVA,  :
               :
      Defendants.   :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court are Defendant Herberth Rodriguez's ("Defendant") motions to suppress information seized pursuant to a cell phone warrant; to suppress historical cell phone location information and toll records seized pursuant to two cell-site warrants; and to suppress out-of-court photographic and video identifications of Defendant.[1]  Defendant also moved to sever Counts Seven and Ten, as well as to sever his trial from his co-defendant's trial.  Finally, Defendant makes numerous requests for discovery.  For the reasons set forth below, Defendant's motions are DENIED.

I.  **BACKGROUND**

On November 2, 2020, the Government filed a complaint charging Defendant with possession of ammunition as an alien admitted under a nonimmigrant visa in violation of 18 U.S.C. § 922(g)(5).  Complaint at 1, ECF No. 1.[2]  On February 12, 2026, a U.S. Grand Jury returned an eleven-count superseding indictment (the "Fourth Superseding Indictment" or "Super. Indict.") against Defendant and co-defendant Elias Martinez Villanueva ("Co-Defendant," together with Defendant, "Defendants").[3]  Super. Indict., ECF No. 181.  The Superseding Indictment charges Defendants with racketeering (Count 1); conspiracy to distribute

---

[1] Defendant also moved to suppress post-arrest statements he made on November 3, 2020.  *See* Defendant's First Motion to Suppress at 6, ECF No. 97.  The Government no longer seeks to introduce these post-arrest statements, *see* Jan. 8, 2026 Government Letter ("Jan. Gov't Ltr.") at 1, ECF No. 153, and so Defendant's motion with respect to this issue is moot.

[2] Citations are to the docket in *United States v. Rodriguez et al.*, 20-CR-548.  Pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

[3] Several indictments preceded this Fourth Superseding Indictment.  *See* ECF Nos. 9, 23, 140.

and to possess with intent to distribute cocaine and marijuana (Count 2); conspiracy to commit the murder of Diego Vanegas Vasquez in-aid-of racketeering (Count 3); murder of Diego Vanegas Vasquez in-aid-of racketeering (Count 4); possessing, brandishing and discharging a firearm during a crime of violence (Count 5); causing the death of Diego Vanegas Vasquez through the use of a firearm (Count 6); unlawful possession of ammunition as an alien illegally and unlawfully in the United States (Count 7); attempted murder of a John Doe 1 in-aid-of racketeering (Count 8); possessing, brandishing and discharging a firearm during a crime of violence (Count 9); unlawful possession of ammunition as an alien illegally and unlawfully in the United States (Count 10); and illegal reentry (Count 11). *Id*. at ¶¶ 9–28. The Fourth Superseding Indictment also contains criminal forfeiture allegations as to Counts One and Two, Counts Five through Seven, and Counts Nine and Ten. *Id.* at ¶¶ 29–34. Defendant is charged in Counts One through Ten. *Id.* at ¶¶ 9–27. Co-Defendant is charged in Counts Three through Six and Count Eleven. *Id*. at ¶¶ 17–22, 28. The charges largely pertain to Defendants' alleged association and activities as members of the 18th Street gang ("18th Street"). *See id*. at ¶¶ 1–2, 4, 8.

On February 13, 2025, Defendant moved (1) to suppress post-arrest statements he made to Government agents following his arrest; (2) to suppress out-of-court photographic and video identifications of Defendant made by law enforcement officers, or alternatively, to hold a *Wade* hearing; and (3) to suppress information from two cellphones seized pursuant to a warrant. *See* Defendant's First Motion to Suppress ("Def's. First Mot. to Suppress") at 6, 11, 25, ECF No. 97. On February 17, 2025, Defendant separately moved to suppress historical cell phone location information and toll records associated with Defendant's cellphones, which were obtained pursuant to two additional warrants. *See* Defendant's Second Motion to Suppress ("Def's

Second Mot. to Suppress") at 2, ECF No. 100.  On March 10, 2025, the Government filed its

opposition to Defendant's motions to suppress.  *See generally* Government's Memorandum of

Law in Response to Defendant Rodriguez's Pretrial Motions ("Government's Opposition" or

"Gov't Opp'n"), ECF No. 110.  On March 18, 2025, Defendant filed his reply in further support

of his motions to suppress.  *See generally* Defendant's Reply ("Def's Reply"), ECF No. 112.

On January 12, 2026, the Court held a suppression hearing on Defendant's motions,[4] at

the close of which the Court directed counsel for the respective parties to file supplemental

briefing.  On January 20, 2026, Defendant and the Government filed their supplemental

briefings.  *See generally* Defendant's Supplemental Briefing ("Def's Suppl. Br."), ECF No. 156;

Government's Supplemental Briefing ("Gov't Suppl. Br."), ECF No. 157.

Trial will commence on Monday, February 23, 2026.

## II.    ALLEGATIONS AND FACTS

The Government alleges Defendants were part of 18th Street, a violent street gang with

members in Queens, New York.  The Government's allegations address two instances of

violence arising in connection with Defendants' membership in 18th Street.  First, the

Government alleges Defendant shot at two individuals, including John Doe-1.  Second, the

Government alleges Defendant and Co-Defendant participated in the killing of Diego Vanegas

Vasquez ("Vasquez").

---

[4] This hearing was limited to the issue of the out-of-court photographic and video identifications of
Defendant.  *See* Jan. Gov't Ltr. at 1; Dec. 19, 2025 Government Letter ("Dec. Gov't Ltr.") at 1, ECF No.
149 ("The government has confirmed that the defendant is not seeking a hearing with respect to his
motion to suppress evidence recovered from the defendant's phone, as the parties agree there is no dispute
of fact as to that motion.").

**A.    The 18th Street Gang and Alleged Acts of Violence**

18th Street is a gang whose members are "required to abide by the rules of [18th Street],"
including by engaging in criminal activity to benefit [18th Street]." Super. Indict. at ¶ 1. 18th
Street collects money from its members and distributes it to other members "who [are]
incarcerated in the United States, Mexico, El Salvador, Guatemala, and Honduras." *Id.* 18th
Street members signify their association with the gang with "the color black and with graffiti,
hand signals and tattoos reading . . .'18,' 'X,' and 'V3.'" *Id.* The gang and its members
"engage[] in acts of violence, including acts involving murder and assault, as well as narcotics
trafficking, production of fraudulent identification documents, promotion of prostitution,
extortion and other criminal activity." *Id.* at ¶ 2. "[V]iolence directed at rival gang members or
at 18th Street members or associates believed to have violated [18th Street's] rules" increases the
"prestige" of members. *Id.*

**B.    The Alleged Shooting on October 10, 2020**

On October 10, 2020, Defendant allegedly "shot at two individuals in connection with his
membership in 18th Street." Gov't Opp'n at 14. Specifically:

> John Doe-1 became involved in a physical altercation with members
> of the 18th Street gang. In response, [Defendant] retrieved a firearm
> that he had stashed near a commercial establishment and fired
> multiple times at a red truck that John Doe-1 was driving. John Doe-
> 1 was not struck and [Defendant] fled from the scene immediately
> after the shooting. [Defendant] was linked to that shooting by,
> among other things, surveillance video and the identification of a
> law enforcement witness.

*Id.*

According to the supporting affidavit for a historical cell-site information warrant:

> NYPD officers who responded to the location identified two .9mm
> caliber cartridge casings manufactured by A-MERC in the vicinity
> of the corner of Roosevelt Avenue and Baxter Avenue. At the
> location, NYPD officers interviewed multiple witnesses and

retrieved surveillance video footage from nearby buildings that showed that at approximately 11:30 p.m., a male fired gunshots from Manuel de Dios Unanue Triangle, which is bounded by Roosevelt Avenue, 83rd Street and Baxter Avenue.

…

Additional video surveillance from approximately 11:30 p.m. depicts a light-skinned man wearing a dark grey hooded sweatshirt, dark jeans, a black mask and tan shoes retrieve a black handgun from a backpack below some flower pots in front of a store located at the corner of Roosevelt Avenue and 83rd Street facing Manuel de Dios Unanue Triangle. Less than a minute later, this same man returns to the flower pots, appears to hand an item, which appears to be a handgun, to a man in a black cap, who then retrieves the above-described backpack and follows the man in the dark grey hooded sweatshirt, dark jeans, and tan shoes. Video of this same location from approximately an hour earlier depicts this same man in the grey hooded sweatshirt, dark jeans and tan shoes appearing to handle the above-described backpack. At this point, the black mask is around this man's chin and his face is visible.

…

Following the October 10, 2020 shooting, an NYPD officer who has had previous in-person interactions with [Defendant] viewed surveillance video of the man wearing the dark grey hooded sweatshirt, dark jeans and tan shoes near the flower pots and positively identified the Shooter as [Defendant].

Def's Second Mot. to Suppress Ex. A at ¶¶ 6, 9, 11.

### C.    The Alleged Shooting on November 1, 2020

On November 1, 2020, Defendant and Co-Defendant allegedly participated in the killing of Diego Vasquez. The Government alleges "[Defendant] approached [Vasquez] on a motorized scooter, driven by [Co-Defendant] and shot and killed Vasquez as he sat in the backseat of a taxi." Gov't Opp'n at 14. Vasquez was purportedly a member of MS-13, a rival gang to 18th Street. Def's Second Mot. to Suppress Ex. B at ¶ 13(b).

**D.    Law Enforcement's Identification of Defendant and Defendants' Arrest**

Prior to his arrest, Defendant was identified by New York City Police Department (the "NYPD") Detective Lenin Garcia ("Detective Garcia" or "Garcia").  *See* January 12, 2026 Hearing Transcript ("Tr.") at 33:16–40:22.  This identification connected Defendant to the October 10th shooting as the alleged shooter.  *See* Def's Second Mot. to Suppress Ex. A at ¶ 11. Detective Garcia worked in the 110th Precinct between 2017 and April 2022.  Tr. at 23:22–23. From December 2019 to April 2022, Detective Garcia worked as a Field Intelligence Officer ("FIO").  *Id.* at 23:24–24:2.  His duties as an FIO included monitoring gang activity such as the activity of 18th Street.  *Id.* at 24:14–18, 25:3–25.  As an FIO, Detective Garcia also worked with government agencies—such as the Federal Bureau of Investigations, the District Attorney's Office, and the U.S. Postal Inspection Service—with whom he exchanged information.  *Id.* at 26:13–22.

While Detective Garcia spoke with a confidential informant (the "CI") on an undisclosed date, the CI notified Garcia about a new "up-and-coming" member in the area, whom Detective Garcia later identified as Defendant.[5]  *Id.* at 27:13–18.  The CI told Detective Garcia Defendant was "the lead shooter for [18th Street]," "wanted to establish a name for himself," and was "very close with the top leaders."  *Id.* at 27:17–18, 30:19–20.  The CI described to Detective Garcia Defendant's appearance as Hispanic, light-skinned, 5'7" or 5'10" with a medium build and a Mohawk hairstyle.  *Id.* at 27:21–28:5, 30:13–14.

---

[5] At the January 12, 2026 hearing, Detective Garcia identified Defendant as "Crepa," an alias Detective Garcia's CI used to identify the new member of 18th Street.  Tr. at 26:23–27:12, 30:23–31:5.  The Fourth Superseding Indictment refers to Defendant's alleged alias as "Kepa."  Super. Indict. at ¶ 8.

In the summer of 2020, Detective Garcia saw Defendant in person at a Dunkin' Donuts located at the intersection of 82nd Street and Roosevelt Avenue.[6]  *Id.* at 28:13–25.  Defendant's appearance at this time matched the description the CI gave Detective Garcia.  *Id.* at 29:1–2. From twenty or thirty feet away, Detective Garcia observed Defendant with a group of 18th Street individuals.  *Id.* at 29:9–16.  After noticing Detective Garcia, the group dispersed, with Defendant choosing to go into a nearby store.[7]  *Id.* at 29:13–18.  Detective Garcia followed Defendant into the store and asked him for identification, which Defendant gave in the form of an Occupational Safety and Health Administration ("OSHA") work card.  *Id.* at 29:17–30:2. Detective Garcia ran the name on the OSHA card and the search returned Defendant's name: Herberth Rodriguez.  *Id.* at 30:5–10.  Detective Garcia did not arrest Defendant at this time.  *See id.* at 30:21–22.

Detective Garcia observed Defendant on numerous other occasions.  *See id* at 31:7–14. Specifically, Detective Garcia observed Defendant five or six times per week at the intersection of 82nd Street and Roosevelt Avenue between the summer of 2020 and October 2020.  *Id.* at 31:7–11.  On these other occasions, Detective Garcia observed Defendant during both the day and night while Garcia was either inside a vehicle or on foot.  *See id.* at 31:2–32:4.  The distance between Detective Garcia and Defendant during these observations was one to two feet.  *Id.* at 32:5–7.

Although Detective Garcia was unable to recall the specific times when they did so, Garcia and Defendant had other personal interactions outside of those previously described.

---

[6] Detective Garcia also indicated he may have seen Defendant on surveillance footage prior to the first interaction in the summer of 2020, although he could not recall because he did not know Defendant's appearance at the time.  *See* Tr. at 44:6–19.

[7] It is unclear whether Defendant entered the Dunkin' Donuts or a separate bodega at this time, and whether this interaction occurred outside or inside.  *Compare id.* at 29:11–16, *with* 46:3–6.

Specifically, Detective Garcia and Defendant exchanged numbers which resulted in coordinating two or three short meetings between the two in an unidentified park in Corona, Queens. *Id.* at 32:12–33:7, 58:9–12. During these meetings, Defendant and Detective Garcia were within a foot away from each other. *Id.* at 32:24–33:1. According to Detective Garcia, the purpose of these meetings was to form a relationship and turn Defendant into a confidential informant. *Id.* at 56:2–7. None of these meetings resulted in Defendant's arrest. *Id.* at 33:2–4. Additionally, Detective Garcia did not take photographs of Defendant during these particular interactions or when Garcia previously observed Defendant, beyond a screenshot of Defendant's OSHA card during the summer of 2020. *See id.* at 48:12–19, 62:7–18.

In October 2020, a member of the 110th Precinct informed Detective Garcia a shooting occurred on October 10, 2020. *Id.* at 33:16–24, 49:17–50:5. Detective Garcia was told 18th Street was involved in the shooting, but he did not play a role in the shooting investigation and was unaware of any suspect or person of interest. *Id.* at 50:6–14, 51:7–11. However, the 110th Precinct squad asked Detective Garcia to see if any confidential informant had knowledge about the October 10th shooting. *Id.* at 50:15–19. Detective Garcia recalled asking at least one confidential informant about the shooting but did not remember what was said during the conversation beyond noting the confidential informant did not affirmatively identify Defendant as the shooter. *Id.* at 50:20–51:1.

Detective Garcia did remember being contacted by an FBI agent named Gabriel Nacelewicz ("Nacelewicz or "Agent Nacelewicz") but could not recall the date Nacelewicz reached out. *Id.* at 51:14–52:11. Agent Nacelewicz mentioned to Detective Garcia the October 10th shooting and 18th Street's potential involvement, and asked Detective Garcia to review still photographs depicting potential suspects. *Id.* at 52:5–11. At the 110th Precinct, Agent

Nacelewicz gave Detective Garcia a double-sided sheet of paper with the two still photographs; one photograph was on each side of the paper. *Id.* at 35:21–36:16. Agent Nacelewicz also showed Detective Garcia the video from which the still photographs were taken. *Id.* at 52:12–16. Detective Garcia recognized Defendant in both the video footage and one of the photographs. *Id.* at 39:14–24, 52:17–19. With respect to the photograph, Detective Garcia testified he recognized Defendant because of his previous interactions with Defendant and familiarity with his appearance; Garcia was familiar with Defendant's Mohawk hairstyle, skin color, and build. *Id.* at 40:5–13. Detective Garcia testified he was "very certain" Defendant was in the photograph. *Id.* at 40:14–17.[8] Detective Garcia did not memorialize his meeting with Agent Nacelewicz, was not read instructions regarding identification procedures, was not presented with a photo array, and could not recall signing the photographs. *See id.* at 40:18–19, 53:1–7, 53:25–54:1, 54:5–12.

On November 3, 2020, law enforcement agents arrested Defendant pursuant to an arrest warrant. Def's First Mot. to Suppress at 6; Gov't Opp'n at 18. On April 21, 2022, Magistrate Judge Lois Bloom issued a warrant for Co-Defendant's arrest. *See* ECF No. 29. Co-Defendant was arraigned before Magistrate Judge Vera M. Scanlon on January 27, 2025. *See* ECF No. 81.

### E.    The Cellphone Warrants

A black LG cellphone (the "LG Phone") was recovered from Defendant's person upon his arrest on November 3, 2020. Def's First Mot. to Suppress at 25; Gov't Opp'n at 16. Separately, pursuant to a search warrant authorized by then-Magistrate Judge Sanket J. Bulsara[9]

---

[8] One other individual appeared in this photograph. *Id.* at 60:3–10. Detective Garcia was unable to recall his name, although he noted at the time he had the individual's government name and street name. *Id.*
[9] Judge Bulsara was later appointed a U.S. District Judge and entered service in December 2024. Biography, https://www.nyed.uscourts.gov/index.php/district-judge-sanket-j-bulsara (last visited Feb. 17, 2026).

on November 10, 2020, law enforcement searched Defendant's bedroom in Queens, New York and recovered a white iPhone (the "iPhone").  *See* Def's First Mot. to Suppress at 25; Gov't Opp'n at 16 n.3.

On November 23, 2020, then-Magistrate Judge Ramon E. Reyes[10] issued a warrant for the two cell phones (the "Cell Phone Warrant"), authorizing a search for fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 922(g)(5) (alien in possession of ammunition), 1959(a)(1) and (a)(5) (conspiracy and murder in-aid-of racketeering), and 21 U.S.C. § 841 (possession with intent to distribute controlled substances).  *See* Gov't Opp'n at 16–17; Def's First Mot. to Suppress Ex. B.

On April 2, 2021, Magistrate Judge Roanne L. Mann issued two separate cell-site warrants to collect historical cell-site data and toll records for the phone number associated with the LG Phone.  Def's Second Mot. to Suppress at 2–3; Gov't Opp'n at 17–18.  The first cell-site warrant sought cell-site data and toll records associated with the phone number for the LG Phone for the time period October 10, 2020, to October 11, 2020 (the "October 10th Warrant").  *See* Gov't Opp'n at 17; Def's Second Mot. to Suppress at 2–3; Def's Second Mot. to Suppress Ex. A. The October 10th Warrant authorized a search for fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 922(g)(5) (alien in possession of ammunition).  *See* Gov't Opp'n at 17; Def's Second Mot. to Suppress Ex. A.

The second cell-site warrant sought cell-site data and toll records associated with the same phone number for the time period October 31, 2020, to November 3, 2020 (the "October 30th Warrant").[11]  *See* Gov't Opp'n at 17; Def's Second Mot. to Suppress at 2–3; Def's Second

---

[10] Judge Reyes was later appointed a U.S. District Judge on November 13, 2023.  Biography, https://www.nyed.uscourts.gov/district-judge-ramon-e-reyes-jr (last visited Feb. 2, 2026).

[11] The Government's Opposition erroneously states the end date for this warrant was November 1, 2020. *See* Gov't Opp'n at 17.

Mot. to Suppress Ex. B.  The October 30th Warrant authorized a search for fruits, contraband, evidence, and instrumentalities of, *inter alia*, violations of 18 U.S.C. §§ 1959(a)(1) and (a)(5) (conspiracy and murder in-aid-of racketeering).  *See* Gov't Opp'n at 17–18; Def's Second Mot. to Suppress Ex. B.

The Government argues Defendant's motion to suppress is moot with respect to the October 10th Warrant because the number associated with the LG Phone did not became active until "after the Attempted Murder of John Doe-1" occurring on October 10, 2020.  Gov't Opp'n at 17.  The Government's mootness argument stands only if it no longer has evidence to introduce under the October 10th Warrant.  The Court construes it as such.  Accordingly, the Defendant's motion with respect to this warrant is moot and focuses its analysis on the October 30th Warrant.  *See United States v. Marinez*, 03-CR-1335, 2004 WL 2754656, at *2 (S.D.N.Y. Dec. 2, 2004) (Batts, J.) ("However, in its opposition to the suppression motion, the Government [argued] no incriminating evidence was found in the van . . . Therefore, because there is no evidence to suppress, the question of whether or not the search was valid is rendered moot.") (internal citation omitted); *United States v. Zhou*, 24-CR-123, 2025 WL 218831, at *1 fn. 2 (E.D.N.Y. Jan. 16, 2025) (Brodie, C.J.) (considering only the evidence the Government "intends to offer at trial").

## III.    MOTIONS TO SUPPRESS INFORMATION FROM DEFENDANT'S CELLPHONES

### A.    Legal Standard

"[T]he Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)).  The probable cause requirement is met "where the totality of circumstances

indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (citing *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007). "This required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants." *Clark*, 638 F.3d at 94 (citing *Stanford v. State of Texas*, 379 U.S. 476, 481 (1965)).

"A warrant[] . . . can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists," meaning the warrant is overbroad, "or by giving so vague a description of the material sought as to impose no meaningful boundaries," meaning the warrant lacks particularity. *United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009) (Block, J.).

Overbreadth arises when a warrant "is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (Briccetti, J.) (quoting *Galpin*, 720 F.3d at 446); *see also United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (Nathan, J.) ("The doctrine of overbreadth represents, in a sense, an intersection point for probable cause and particularity principles: it recognizes, in pertinent part, that a warrant's unparticularized description of the items subject to seizure may cause it to exceed the scope of otherwise duly established probable cause."). This is not to say all far-reaching warrants are impermissible. In fact, "[a] warrant permitting fairly broad types of materials is permitted if the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause to seize items in each of these categories." *Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) (Oetken, J.) (citation and internal quotation marks omitted). Moreover, "in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast," and therefore the Second Circuit has

held "a broad warrant allowing the government to search [the defendant's] laptop for potentially extensive evidence of charged crimes committed using that laptop does not offend the Fourth Amendment, as long as that warrant meets the three particularity criteria." *United States v. Purcell*, 967 F.3d 159, 179 (2d Cir. 2020) (quoting *United States v. Ulbricht*, 858 F.3d 71, 100, 102-03 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018)) (internal quotation marks omitted) (alteration in original).

To satisfy the Fourth Amendment's particularity requirement, on the other hand, a warrant must: (1) "identify the specific offense for which the police have established probable cause;" (2) "describe the place to be searched;" and (3) "specify the items to be seized by their relation to designated crimes." *Galpin*, 720 F.3d at 445–46 (internal citations omitted). Under this inquiry, the Court must determine "whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, 09-CR-625, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (Baer, J.); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize.") (citation modified); *Zemlyansky*, 945 F. Supp. at 459 (finding warrant insufficiently particularized when "missing from all of these categories [to be searched for and seized]—and from the warrant in general—are any instructions to the officers to search for and seize records related to the five modality clinics at the center of the alleged conspiracy in question, related to particular suspects in the case, limited to the time period of the suspected conspiracy, related to the crimes alleged, or any other limits.").

When considering a warrant's particularity, the Second Circuit has held "broadly worded categories of items available for seizure" do not necessarily render a warrant deficient. *United*

*States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990).  However, catch-all categories authorizing searches for "'evidence of *a* crime,' that is to say, any crime, is so broad as to constitute a general warrant" in violation of the Fourth Amendment.  *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) ("Mere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize.").

Even if a warrant were constitutionally defective, its fruits will not be suppressed if the executing officers acted in good faith.  As explained in *Purcell*:

> "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).  Thus, evidence seized pursuant to a defective warrant will not be suppressed if it was "obtained in objectively reasonable reliance" on the invalid warrant. *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).  "[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," in most cases, "there is no police illegality and thus nothing to deter." *Id.* at 920–21, 104 S.Ct. 3405.

967 F.3d at 179.

However, the good faith exception does not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

Moreover, when inquiring into the constitutionality of a warrant, the Second Circuit has advised trial courts to "accord substantial deference to the [issuing judicial officer's] finding" on the issue of probable cause, limiting review "to whether the issuing judicial officer had a

14

substantial basis for the finding of probable cause." *United States v. Singh*, 390 F.3d 168, 181 (2d Cir. 2004) (citing *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).

### B.    Application

The Court finds the Cell Phone Warrant and October 30th Warrant did not violate the Fourth Amendment.

### 1.    The Cell Phone Warrant

The Court finds the Cell Phone Warrant did not offend the Fourth Amendment.  As an initial matter, Defendant's sole ground of attack on the Cell Phone Warrant is that the warrant lacked probable cause (and relatedly, that there was no good faith to otherwise uphold the Cell Phone Warrant).  *See* Def's First Mot. to Suppress at 27 ("The Affidavit lacked probable cause to believe that either phone was used in the commission of the stated crimes, or contained evidence of those crimes."); *id.* at 29–30 (discussing requirements for a finding of probable cause); Def's Reply at 7 ("There are insufficient facts to establish the requisite probable cause."); *id.* ("Accordingly, the challenged warrants lacked probable cause and the Court should suppress the evidence obtained from the Cell Phone and Cell Site search warrants.").  Because Defendant asserts the warrant was wholesale unsupported by probable cause, overbreadth and particularity are not the issues at stake.  Overbreadth and particularity presume a warrant was supported by *some* probable cause, but that law enforcement went beyond the established probable cause so as to render the warrant constitutionally infirm.  Here, the issue is cabined to the question of whether *any* probable cause existed to support the Cell Phone Warrant.

The Government has sufficiently established probable cause with respect to the Cell Phone Warrant.  The affidavit accompanying the Cell Phone Warrant described law enforcement investigations into 18th Street in Queens, New York.  Def's First Mot. to Suppress Ex. B at ¶ 2.

15

The affidavit specifically described the November 1st murder of Vasquez in the backseat of a taxicab.  *Id.* at ¶¶ 7–11.  Reports indicated the shooting was carried out by two individuals on an electric scooter.  *Id.* at ¶ 10.  Reports also indicated Defendant was riding a scooter in the vicinity at the time Vasquez was shot.  *Id.* at ¶ 11.  Moreover, based on their knowledge, training, and experience as a law enforcement officer, the affiant described how 18th Street members regularly used cellphones to communicate with other gang members, to plan crimes and to plan methods of avoiding law enforcement detection.  *Id.* at ¶¶ 18–19.  Given Vasquez's association with the rival gang MS-13, and the aforementioned facts set forth in the affidavit accompanying the Cell Phone Warrant, there was a substantial basis for Judge Reyes to find a fair probability "that contraband or evidence of a crime" would be found in Defendant's cellphone.  *Clark*, 638 F.3d at 94.  Specifically, there was a fair probability evidence of Defendant's role in Vasquez's murder would be uncovered in a search of Defendant's cellphone, which would encompass three of the offenses listed in the Cell Phone Warrant: (1) alien in possession of ammunition, (2) conspiracy and (3) murder in-aid-of racketeering.  *See* Gov't Opp'n at 16–17; *see generally* Def's First Mot. to Suppress Ex. B.  The Cell Phone Warrant affidavit also described the recovery from Defendant's residence of a white and powdery substance consistent with cocaine, blue pills consistent with Xanax, bags consistent with those used to package narcotics, a scale consistent with one used to weigh narcotics, and other narcotics-related materials.  Def's First Mot. to Suppress Ex. B at ¶ 13.  The affidavit noted individuals who engage in narcotics distribution often use cellphones to communicate regarding narcotics distribution.  *Id.* at ¶ 20.  Given these facts, there was also a fair probability evidence showing possession of a controlled substance with intent to distribute would be found in Defendant's cellphones, which was another offense outlined in the Cell Phone Warrant.  *See* Def's First Mot. to Suppress Ex. B.

16

Defendant argues probable cause for the Cell Phone Warrant required "specific information to connect either phone to the alleged crimes with which [Defendant] has been charged, or which authorities were investigating." Def's First Mot. to Suppress at 27. Specifically, Defendant argues the affidavit accompanying the Cell Phone Warrant lacked probable cause to "believe that either phone was used in the commission of the stated crimes." *See id.* at 27, 31. Defendant cites numerous district court cases for the proposition that a "[s]ufficient nexus is found between a cell phone and alleged criminal activities when the four corners of the affidavit contain specific facts establishing either the phone's use or physical placement in connection with the offense, in addition to the affiant's training and experience." *See id.* at 30 (collecting cases).

Despite the accuracy of the standard Defendant calls to the Court's attention, Defendant conflates a sufficient condition to find probable cause with a necessary one. Indeed, Defendant places heavy reliance on *United States v. Silva*, a district court case which held the absence of "factual allegations suggesting that [the defendant] ever used his phone in connection with the crimes described in the [affidavit]" failed to establish probable cause. 23-CR-204, 2024 WL 3488305, at *8 (S.D.N.Y. July 19, 2024) (Gardephe, J.). But Defendant overlooks the Second Circuit's reversal of this very opinion, which expressly found "a search warrant does not require probable cause of the *use* of the property in furtherance of criminal conduct." *See United States v. Silva*, 146 F.4th 183, 186, 190 (2d Cir. 2025). A law enforcement-affiant's personal expertise combined with attestation to a defendant's membership in a criminal enterprise and "familiar[ity] with the manner in which gang members and individuals engaged in violent crime use cell phones in connection with such activity" can establish probable cause for a cellphone warrant. *See id.* at 192, 193 (alteration in original).

The Court must reject Defendant's argument given the substantial similarities between the Second Circuit's decision in *Silva* and the instant case.  On this basis, the Court concludes the Cell Phone Warrant satisfied the probable cause requirement of the Fourth Amendment.

In any event, law enforcement's reliance on the Cell Phone Warrant would fall under the good-faith exception to the exclusionary rule.  *See Purcell*, 967 F.3d at 179.  There is no evidence Judge Reyes was knowingly misled or otherwise abandoned his judicial role when issuing the Cell Phone Warrant.  Nor does Defendant argue the Cell Phone Warrant was so facially deficient rendering reliance upon it unreasonable.  Instead, Defendant argues the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable.  *See* Def's Reply at 8.  However, this is not a situation involving a "bare bones" affidavit.  *See Silva*, 146 F.4th at 194.  The Cell Phone Warrant affidavit put forth specific factual allegations pertaining to Defendant's involvement in the Vasquez shooting and illicit possession of controlled substances.  The Court does not find the affidavit was "totally devoid of factual circumstances to support conclusory allegations."  *Id.* at 194 (internal citation omitted).  For these reasons, law enforcement's reliance on the warrant was in good faith, precluding application of the exclusionary rule.

**2.  The October 30th Warrant**

Defendant's attack on the October 30th Warrant is also cabined to the issue of probable cause (and neither overbreadth nor particularity are at issue).  *See* Second Mot. to Suppress at 4–6; Def's Reply at 6–7.  Similar to the analysis conducted with respect to the Cell Phone Warrant, the October 30th Warrant was supported by probable cause.  The October 30th Warrant described in detail the shooting on November 1, 2020, and the factual allegations linking Defendant to the shooting.  *See* Def's Second Mot. to Suppress Ex. B at ¶¶ 5–25.  The October

18

30th Warrant stated the shooting was carried out by two individuals on an electric scooter.  *Id.* at ¶¶ 10, 16.  Additionally, reports indicated Defendant was riding a scooter in the vicinity and at the same time Vasquez was shot.  *Id.* at ¶ 16.  Any doubt as to probable cause is removed by text messages recovered from Defendant's LG Phone pursuant to the Cell Phone Warrant and described in the October 30th Warrant affidavit.  Specifically, text messages from Defendant's LG Phone reveal what appear to be admissions by Defendant to committing the killing, including details matching the circumstances of the shooting.  *See id.* at ¶¶ 19–22.  For the foregoing reasons, there was a fair probability evidence of Defendant's role in Vasquez's murder would be uncovered in a search of Defendant's cell-site data and toll records.

Defendant relies on the same deficient argument from *Silva* reasoning there must be allegations Defendant's phone was used in any of his charged crimes, or that such use is captured on surveillance videos.  *See* Def's Reply at 7.  For the reasons stated above, this argument fails.

Moreover, given the level of specificity with which the October 30th Warrant paralleled the Cell Phone Warrant, the same good-faith-exception analysis conducted above would apply.  Finally, Defendant's fruit-of-the-poisonous-tree argument necessarily fails due to the Court finding the Cell Phone Warrant valid.  *See* Def's Second Mot. to Suppress at 6–7.

## IV.  MOTION TO SUPPRESS OUT-OF-COURT PHOTOGRAPHIC AND VIDEO IDENTIFICATIONS

### A.    Legal Standard

#### 1.    Federal Rules of Evidence

Federal Rule of Evidence ("FRE") 701 provides, if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Under prong (a), testimony is rationally based on the witness's perception when it involves "first-hand knowledge or observation." *United States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008) (citing *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992)). As for prong (b), the helpfulness requirement is "principally designed to provide assurance[] against the admission of opinions which would merely tell the jury what result to reach." *United States v. Campo Flores*, 945 F.3d 687, 706 (2d Cir. 2019) (citing *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007)) (alteration in original) (quotation marks omitted). When an "opinion is the result of factors not otherwise possessed by or communicated to the jury, the opinion testimony is likely to be helpful." *See United States v. Arroyo*, 600 Fed. App'x. 11, 15 (2d Cir. 2015) (finding the "District Court acted well within its discretion in determining that [the building superintendent] Gjelaj's identification of [the defendant] as the man in the video was based on factors that the jury did not possess, namely Gjelaj's familiarity with [the defendant's] manner of dress, gait, and demeanor observed in Gjelaj's several prior encounters with [the defendant].");  *United States v. Woodford*, 18-CR-654, 2019 WL 5457854, at *14 (E.D.N.Y. Oct. 23, 2019) (Matsumoto, J.). Prong (c) prohibits a lay opinion from being based on "scientific, technical, or other specialized knowledge," instead requiring the opinion be "the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). Moreover, the foundational requirements of Rule 701 "do not permit a law

enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience." *Id*. at 216.

Separately, Rule 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Under Rule 404(b) "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," although this evidence may be admitted for "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

A district court's decision on evidentiary matters, including issues under Rules 701, 403, and 404(b), is within the discretion of the court. *See Garcia*, 413 F.3d at 210 (noting a district court's decision to admit evidence is subject to an "abuse of discretion" standard); *United States v. Awadallah*, 436 F.3d 125, 134 (2d Cir. 2006).

### 2.    Fifth Amendment Due Process Clause

Separate from the FRE, the Fifth Amendment provides, in part, "[n]o [p]erson shall… be compelled in any criminal case to be a witness against himself, **nor be deprived of life, liberty, or property, without due process of law**[.]" U.S. Const. amend. V (emphasis added).  Pursuant to the Due Process Clause of the Fifth Amendment, a pre-trial identification must be excluded if the procedure that produced the identification is so impermissibly suggestive and conducive to irreparable mistaken identification. *See Neil v. Biggers*, 409 U.S. 188, 196 (1972); *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994).  However, the identification may still be admitted

21

even if the pre-trial procedure was impermissibly suggestive "if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." *Bautista*, 23 F.3d at 730 (citing *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991)).

The factors a court considers when determining if an identification possesses sufficient indicia of reliability (also known as the *Biggers* factors) are (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009) (citing *Biggers*, 409 U.S. at 199–200). The totality of circumstance must be assessed to determine the existence of reliability, but no factor alone is dispositive. *See Brisco*, 565 F.3d at 89.

Moreover, while the Second Circuit held a *Wade* hearing can on occasion be helpful in evaluating a claim of an unduly suggestive identification, no *per se* rule requires such a hearing. *See United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984).

### B.    Application

The Court finds the out-of-court photographic and video identifications made by Detective Garcia[12] are admissible under both the FRE and Fifth Amendment Due Process Clause.

### 1.    Rule 701

Detective Garcia's identification satisfies the requirements of Rule 701. Detective Garcia testified his identification of Defendant was based on numerous instances when he observed Defendant in-person. Specifically, Detective Garcia, as an FIO charged with monitoring gang

---

[12] The Government stated it will not seek to introduce any identifications made by Agent Nacelewicz and so the Court's analysis is focused on Detective Garcia's identification. Gov't Opp'n at 26 n.12.

activity, observed Defendant and personally interacted with him in the summer of 2020.  Tr. at 29:3–30:2.  On one occasion, Detective Garcia saw Defendant's appearance, including his light-skin, height of 5'7" or 5'10", medium build, and Mohawk hairstyle.  *Id.* at 27:21–28:5, 29:1–2, 30:13–14.  Detective Garcia also observed Defendant five or six times per week at the intersection of 82nd Street and Roosevelt Avenue between the summer of 2020 and October 2020, sometimes at night and at other times during the day.  *Id.* at 31:7–11, 32:2–3.  The distance between Detective Garcia and Defendant during these observations was one to two feet.  *Id.* at 32:5–7.  Moreover, Detective Garcia and Defendant would meet in a park on several occasions, where they would be within a foot away from each other.  *Id.* at 32:12–33:7, 32:24–33:1, 58:9–12.  Taken together, these interactions form the basis for opinion testimony involving Detective Garcia's "first-hand knowledge or observation" of Defendant.  *Yannotti*, 541 F.3d at 125.  Detective Garcia's testimony could be helpful to the jury in determining a fact in issue because he would speak to factors the jury would not otherwise possess—namely, Defendant's "manner of dress, gait, and demeanor observed in [the witness'] several prior encounters."  *See Arroyo*, 600 Fed. App'x. at 15.

Because Detective Garcia's testimony is based on simple observations and conversations with Defendant, no dependency on scientific, technical, or other specialized knowledge has been presented.  The Court is mindful of concerns a jury may improperly defer to Detective Garcia's lay opinion because of any specialized training or experience he has as a police officer.  *See* Def's First Mot. to Suppress at 17–18; *Garcia*, 413 F.3d at 216 ("We hold that the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience.").  However, the specialized training and experience the *Garcia* case

23

was concerned with is distinct from the observations and conversations at issue in this case.

*Garcia* focused on opinion partly based on intercepted phone conversations, research conducted

through law enforcement databases, and knowledge of drug deal code words. *Garcia*, 413 F.3d

at 216. The cases Defendant cites were similarly concerned with the sort of specialized training

and experience not at issue here. *See, e.g.*, *United States v. Haynes*, 729 F.3d 178, 195 (2d Cir.

2013) (describing an opinion based on the mechanics of how a gas tank functioned including the

interaction between gas floats and gauges); *Leon v. TransAm Trucking. Inc.*, 18-CV-9755, 2020

WL 728785, at *3 (S.D.N.Y. Feb. 13, 2020) (Liman, J.) (officer's conclusion as to the apparent

contributing cause of an accident admittedly based on years of experience and training at a police

academy). By contrast, Detective Garcia's opinion is based on simple observations and

interactions with Defendant. Although Detective Garcia's opportunities to view Defendant were

linked to his role as an FIO, the observations from which Detective Garcia identified Defendant

were founded on the same everyday perceptions an average layperson would have. For this

reason, Detective Garcia's identification does not run afoul of Rule 701(c). However, the Court

cautions the Government to avoid eliciting the type of testimony based on specialized knowledge

or experience that would violate the dictates of Rule 701(c).

Contrary to Defendant's suggestion, a lay opinion need not be based on contemporaneous

observations of the scene of the alleged crime or incident at issue. *See* Def's First Mot. to

Suppress at 14–15. Courts in this circuit have admitted identifications based only on

surveillance footage and a witness' prior familiarity with the defendant. *See, e.g.*, *United States

v. Edwards*, 23-CR-7200, 2025 WL 25658, at *4 (2d Cir. Jan. 3, 2025) (allowing a detective who

observed the defendant for over twelve years to identify the defendant as the shooter in video

footage); *United States v. Walker*, 974 F.3d 193, 205 (2d Cir. 2020) (allowing a probation officer

24

to identify the defendant in surveillance footage after observing the defendant for many hours up to the time of the robbery).

Setting aside Defendant's reliance on out-of-circuit caselaw for his substantial-and-sustained-contact test, *see* Def's First Mot. to Suppress at 15, Detective Garcia's numerous interactions with, and observations of, Defendant certainly qualify as substantial and sustained. The fact Detective Garcia's interactions with, and initial identification of, Defendant took place more than four years ago, *see id.* at 15, is more appropriately a subject raised on cross-examination. Purported inconsistencies between Detective Garcia's testimony and prior Government representations, *see* Def's Suppl. Br. at 3, similarly fail to render the identification inadmissible. At most, these purported inconsistencies portray the value of holding a suppression hearing to resolve factual disputes and clarify the record. The Court finds Detective Garcia's testimony at the suppression hearing credible and sufficient, and Defendant is welcome to raise any purported inconsistencies on cross-examination.

### 2.    Rules 403 and 404(b)

Detective Garcia's identification of Defendant also satisfies Rules 403 and 404(b). Defendant's arguments under Rule 403 mirror those made with respect to Rule 701; Defendant argues there is a risk of presenting needlessly cumulative evidence and wasting the Court and jury's time because "the jury will be positioned as well as, if not better than, the NYPD identifying officer[]" to review the surveillance footage and come to a determination on whether Defendant is in the footage. *See* Def's First Mot. to Suppress at 18–19. For the reasons discussed above, Detective Garcia's identification would not waste the Court's or jury's time. Instead, the identification would present probative testimony speaking to factors the jury would otherwise not possess. Thus, the Court finds the probative value of Detective Garcia's

25

identification is not substantially outweighed by a danger of needlessly cumulative evidence or wasting time.

Defendant also argues Rules 403 and 404(b) preclude Detective Garcia's testimony because it speaks to Detective Garcia's familiarity with Defendant based on the latter's gang membership and violent reputation. Def's Suppl. Br. at 4–5. Defendant's argument overlooks the purpose of Detective Garcia's testimony about Defendant's association with 18th Street and his violent reputation. Rather than being used to show Defendant acted in accordance with a particular character on a particular occasion, Detective Garcia's testimony establishes the reason he chose to monitor Defendant and become familiar with his appearance. In other words, this testimony forms the foundation for how and why Detective Garcia was able to identify Defendant, which are both substantially probative topics. For these reasons, Detective Garcia's testimony is admissible.

### 3. The Due Process Clause

Allowing Detective Garcia's identification of Defendant comports with the Fifth Amendment Due Process Clause because the identification was neither impermissibly suggestive nor conducive to irreparable mistaken identification. *See Biggers*, 409 U.S. at 380; *United States v. Bautista*, 23 F.3d at 729. Although prior to the identification Detective Garcia was told 18th Street was involved in the shooting on October 10, 2020, he was not told Defendant was a suspect or person of interest. Tr. at 50:6–14, 51:7–11. Garcia also did not investigate the shooting beyond asking a confidential informant if they had any information to pass along. *Id.* at 50:6–14, 50:20–51:1, 51:7–11. Absent from the record is any indication Detective Garcia was pressured to identify Defendant or otherwise presented with coercive or suggestive elements during the identification.

Defendant argues the lack of a particular procedure employed when Detective Garcia was shown the two photographic stills and surveillance video from the night of the October 10th shooting rendered the procedure unduly suggestive. *See* Def's Suppl. Br. At 2. Specifically, Defendant complains Detective Garcia was not presented with a photo-array or instructions. *See id.* First, it is not clear confirmatory identifications by law enforcement officers familiar with a defendant are unduly suggestive when a surveillance video or photographic stills are shown. *See United States v. Stephenson*, 20-CR-511, 2021 WL 4972601, at *1, 4 (E.D.N.Y. Oct. 26, 2021) (Donnelly, J.) ("As an initial matter, the *Biggers* framework is not clearly apposite . . . *Biggers* typically concerns the reliability of an eye witness' identification; in this case, the defendant challenges a confirmatory identification by his parole officer" who was shown surveillance footage).

Second, even assuming *arguendo* the procedure utilized in this case was unduly suggestive, as previously discussed Detective Garcia's identification was independently reliable under the *Biggers* factors and thus admissible. *See Bautista*, 23 F.3d at 730. Detective Garcia observed Defendant repeatedly prior to identifying him in the surveillance footage and photographic stills. *See supra* at 6–9. Some of these instances included personal interactions between Detective Garcia and Defendant where they would be within a foot or two away from each other. *See supra* at 7. As an FIO investigating gang activity, Detective Garcia paid particular attention to Defendant, as evidenced by Detective Garcia's testimony at the suppression hearing. *See supra* at 6–9. Moreover, Detective Garcia was "very certain" Defendant was the individual in one of the photographic stills. *See supra at* 9. Also, a relatively short temporal gap existed between when Detective Garcia familiarized himself with Defendant's appearance and when the identification was made—between the summer of 2020

27

and October 2020.  *See supra* at 6–9.  Because the record does not make clear whether the individual in the photograph Detective Garcia identified Defendant in was actually Defendant, this *Bigger* factor is at best neutral.

Recognizing none of the *Bigger* factors are dispositive on their own, the Court finds the totality of circumstances demonstrates Detective Garcia's identification was independently reliable.  Defendant's remaining objection to purported inconsistencies on this point, *see* Def's Suppl. Br. at 2–3, are better resolved through cross-examination at trial.

For these reasons, Detective Garcia's identification of Defendant is admissible and would not offend the Due Process Clause.[13]

## V.    MOTIONS TO SEVER

### A.    Legal Standard

Federal Rule of Criminal Procedure 8(a) provides a defendant may be charged in separate counts with two or more offenses if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed R. Crim. P. 8(a).  Rule 8(b) similarly provides an indictment may charge two or more defendants if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed R. Crim. P. 8(b).  Defendants may be charged "in one or more counts together or separately" and "need not be charged in each count."  *Id.*

When separate offenses are properly joined under Rule 8, a defendant may request severance of the offenses by invoking Federal Rule of Criminal Procedure 14, which provides

---

[13] Given the suppression hearing held to hear Detective Garcia's testimony and the Court's findings above with respect to the procedures involved in Detective Garcia's identification, no additional *Wade* hearing or proceeding is required to evaluate the admissibility of the identification.

"the [C]ourt may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" when joinder "appears to prejudice a defendant." Fed R. Crim. P. 14(a).

However, a defendant "carries a heavy burden of showing that joinder will result in substantial prejudice" under Rule 14. *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994)). For example, it is insufficient for a defendant to show they "might have had a better chance for acquittal at a separate trial." *Id.* (quoting *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir. 1978)). Instead, severance under Rule 14 is proper "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

This heavy burden imposed by Rule 14 on defendants reflects the design of joinder which is to "promote economy and efficiency and to avoid a multiplicity of trials." *Page*, 657 F.3d at 129 (citing *Zafiro*, 506 U.S. at 540). The decision of whether to sever under Rule 14 is thus "highly fact specific" and "committed to the sound discretion of the district court." *United States v. Curanovic*, 17-CR-404, 2017 WL 4402452, at *3 (E.D.N.Y. Oct. 2, 2017) (Matsumoto, J.) (citing *Zafiro*, 506 U.S. at 541). As an alternative to severing the offenses, the court is within its right to take less drastic measures such as imposing limiting instructions, which often suffice to cure any risk of prejudice and avoid severance. *Page*, 657 F.3d at 129 (citing *Zafiro*, 506 U.S. at 539).

B.      **Application**

1.      **Severing of Counts Seven and Ten**

Defendant argues Counts Seven and Ten of the Fourth Superseding Indictment[14] should be severed from the other counts filed against him.  Def's First Mot. to Suppress at 21–24.  Both Counts Seven and Ten charge Defendant with being an alien who was illegally and unlawfully in the United States while in possession of ammunition, and both counts correspond to the shootings on November 1, 2020, and October 10, 2020, respectively.  *Id.* at 21; Super. Indict. at ¶¶ 23, 27.  Defendant specifically argues "[t]he accusations that classify [Defendant] as an alien present in the United States on a nonimmigrant visa are inherently prejudicial and will taint the jury's deliberations and consideration of the other charges in the [Third Superseding Indictment]."  Def's First Mot. to Suppress at 21.  In support of his argument, Defendant points to the "raised hysteria and the public ire against the recent flood of immigrants to the U.S.," as well as the "rash of news reports filled with sensational stories about illegal immigrants who are members of a criminal gangs [sic] that murder citizens and assault police officers."  *Id.* at 22.

The Court disagrees.  The Second Circuit "has squarely held . . . that joinder of an alien-in-possession count with other charges is proper 'where the same evidence will support both of the joined counts.'"  *United States v. Levy*, 04-CR-559, 2005 WL 2179650, at *1 (E.D.N.Y. Sept. 9, 2005) (Garaufis, J.) (citing *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999)).  Counts Seven and Ten charge Defendant with possessing the very same ammunition used in the 2020 shootings.  *See* Super. Indict. at ¶¶ 23, 27.  These shootings form the basis for other offenses

---

[14] Defendant filed his First Motion to Suppress in relation to the Second Superseding Indictment (i.e., prior to the U.S. Grand Jury's return of the Fourth Superseding Indictment).  However, given Counts Seven and Ten in the Fourth Superseding Indictment are nearly identical to Counts Seven and Ten in the Second Superseding Indictment, *compare* Super. Indict. at ¶¶ 23, 27, *with* Second Superseding Indictment at ¶¶ 23, 27, at ECF No. 28, the Court construes Defendant's motion as applying to the Fourth Superseding Indictment as well.

Defendant has been charged with.  *See id.* at ¶¶ 9–28 (outlining the offenses against Defendants).

Thus, the same evidence will support both the alien-in-possession counts and counts linked to the

murder of Vasquez and attempted murder of John Doe-1.

The Court acknowledges Defendant's argument regarding the current atmosphere and

rhetoric surrounding immigrants in the United States.  However, the Court agrees with the

Government on Defendant's argument being insufficient to meet the heavy burden of showing

joinder of these offenses would result in *substantial* prejudice.  *See Page*, 657 F.3d at 129; *see*

*also United States v. Lopez*, 477 F.3d 1110, 1116 (9th Cir. 2007) ("No law supports Lopez's

contention that the jury's knowledge that he was an illegal alien created 'prejudice of such

magnitude that the defendant's right to a fair trial [was] abridged.'").

Nevertheless, out of an abundance of caution and at the Government's suggestion, the

Court will give a limiting instruction directing the jury to consider Defendant's status (only to

the extent it is established)—an alien illegally and unlawfully in the United States—for the

limited purpose of determining his citizenship status at the time he allegedly committed the

crimes charged in Counts Seven and Ten.[15]  *See* Gov't Opp'n at 44.  This limiting instruction

will strike the balance between preventing substantial prejudice from infecting Defendant's trial

and promoting the judicial economy and efficiency Rules 8 and 14 enshrine.

## 2.    Severance of Defendant and Co-Defendant's Trials

Defendant's First Motion to Suppress also sought to sever his trial from Co-Defendant's

trial.  *See* Def's First Mot. to Suppress at 24–25.  Defendant's argument was predicated upon the

fact Co-Defendant had only recently been arrested.  *Id.* at 24.  It was also unclear at the time of

filing Defendant's motion whether the Government would seek the death penalty against Co-

---

[15] The Government's Opposition Brief seems to erroneously refer to Count Four rather than Count Ten when discussing the viability of a limiting instruction.  *See* Gov't Opp'n at 44.

Defendant, as opposed to Defendant for whom the Government determined the death penalty would not be sought. *See id.* This raised the specter of Defendant's trial—then scheduled for June 10, 2025—being delayed due to Co-Defendant's review of "voluminous discovery," investigation of the allegations, and grappling with potentially "lengthy mitigation materials[.]" *Id.*

However, circumstances have changed since Defendant sought to sever his trial from Co-Defendant's. First, the Court has adjourned the trial from June 10, 2025, to February 23, 2026.[16] *See* Scheduling Order, ECF No. 105. Second, the Government has decided not to pursue a death penalty sentence against Co-Defendant. *See* June 18, 2026 Government Letter, ECF No. 119. Moreover, at a recent status conference, defense counsel conceded this portion of his motion is moot in light of the Government's decision not to seek a death penalty sentence against Co-Defendant. *See* Tr. at 6:17–24 (stating "[t]hat motion's moot" in response to whether there was a seek-or-no-seek opinion).

For these reasons, the Defendant's motion to suppress, with respect to severing his trial from Co-Defendant, is moot.

## VI.    REQUESTS FOR DISCLOSURE OF EVIDENCE

### A.    Legal Standard

It is well-established the Government must produce certain exculpatory and impeachment evidence to a defendant pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150, 153–54 (1972). *Brady* requires the disclosure of evidence favorable to a defendant when the evidence has a "reasonable probability" of changing the outcome of a trial or a plea proceeding. *United States v. Coppa*, 267 F.3d 132, 143 (2d Cir. 2001). Disclosure

---

[16] The Court excluded time in the interest of justice under the Speedy Trial Act through and including the date of trial. *See* February 26, 2025 Order; 18 U.S.C. § 3161.

to a defendant need only be made "in time for its effective use," and not upon the mere request of a defendant.  *See id.* at 144.  *Giglio* requires the disclosure of evidence affecting the credibility of witnesses whose testimony may be determinative of guilt or innocence.  *Giglio*, 405 U.S. at 154. *Giglio* evidence also need not be disclosed immediately upon request by a defendant, but only in time for its effective use.  *See Coppa*, 267 F.3d at 142, 144.

The Government is also subject to disclosure obligations under 18 U.S.C. § 3500 and Federal Rules of Criminal Procedure 16 and 26.2.  Section 3500 (and Rule 26.2 which imports the substance of § 3500 into the Federal Rules of Criminal Procedure), instructs the Government to produce "any statement [of a Government witness] in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b); *see* Fed. R. Crim. P. 26.2.  By the plain terms of § 3500, the Government need not disclose witness statements until "said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a).  Rule 16 provides for broader discovery and inspection obligations in criminal cases and is not constrained by the same timing restrictions included in § 3500.  *See generally* Fed. R. Crim. P. 16.

**B.    Application**

Defendant's First Motion to Suppress includes various requests for discovery materials, including: (1) information impeaching the credibility of any witnesses the Government might put forth at trial; (2) statements by witnesses tending to show Defendant was not involved in the crimes alleged, and related notes or memorandum; and (3) numerous categories of Rule 16 evidence.  *See* Def's First Mot. to Suppress at 3–6.

Defendant acknowledges the Government has already "provided the defense with a voluminous amount of discovery."  *Id.* at 6.  For its part, the Government has represented it is

"well aware of its obligations under *Brady* and *Giglio* and will continue to comply with such obligations[,]" and it "will continue to comply with its Rule 16 obligations and address [Defendant's] requests well in-advance of the 2026 trial date."  Gov't Opp'n at 48, 50. Defendant has not provided a reason to suspect the Government will fail to comply with its obligations prior to trial and so, to the extent Defendant's requests are intended as a motion to compel immediate disclosure, the motion is denied without prejudice as premature.  Defendant may raise more specific concerns about the Government's disclosure of materials as trial approaches, if necessary.

## VI.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motions to suppress, motions to sever, and requests for discovery.  However, the Court will impose a limiting instruction directing the jury to consider Defendant's status as an alien illegally and unlawfully in the United States, only to the extent this is established at trial, for the sole purpose of determining his citizenship status at the time he allegedly committed the crimes charged in Counts Seven and Ten.

**SO ORDERED.**

**s/WFK**

_____

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: February 17, 2026
    Brooklyn, New York

34